168 P.3d 826 (2007)
Marilou RICKERT, Respondent,
v.
STATE of Washington, PUBLIC DISCLOSURE COMMISSION; and Susan Brady, Lois Clement, Earl Tilly, Francis Meartin and Mike Connelly, members of the Public Disclosure Commission, Petitioners.
No. 77769-1.
Supreme Court of Washington, En Banc.
Argued June 29, 2006.
Decided October 4, 2007.
William B. Collins, Linda A. Dalton, Jean Marie Wilkinson, Attorney General's Office, Govt & Enforcement, Olympia, for Petitioners.
Venkat Balasubramani, Aaron Hugh Caplan, ACLU of Washington, Seattle, for Respondent.
William R. Maurer, Michael E. Bindas, Seattle, for Amicus Curiae (Institute for Justice Washington Chapter).
J.M. JOHNSON, J.
¶ 1 The United States and Washington Constitutions both protect the right of free *827 speech, and political speech is the core of that right. The notion that a censorship scheme like RCW 42.17.530(1)(a) may be constitutionally enforced by a government agency erroneously "presupposes [that] the State possesses an independent right to determine truth and falsity in political debate." State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 624-25, 957 P.2d 691 (1998) (plurality opinion). Yet, "`[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind.'" Id. at 625, 957 P.2d 691 (internal quotation marks omitted) (quoting Meyer v. Grant, 486 U.S. 414, 419, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988)). This court has previously agreed that state censorship is not allowed: "The State cannot `substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government.'" Id. at 626, 957 P.2d 691 (quoting Riley v. Nat'l Fed'n of Blind, Inc., 487 U.S. 781, 791, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)). The present case provides an opportunity to vigorously reaffirm the law on this vital constitutional issue.
¶ 2 In 119 Vote No! Committee, this court struck down former RCW 42.17.530(1)(a) (1988). That version of the statute prohibited any person from sponsoring, with actual malice, a political advertisement containing a false statement of material fact. The legislature subsequently amended the statute to proscribe sponsoring, with actual malice, a political advertisement containing a false statement of material fact about a candidate for public office. LAWSof 1999, ch. 304, § 2(1)(a). Like the Court of Appeals below, we conclude that the legislature's modification of the statutory prohibition fails to rectify its unconstitutionality.[1] RCW 42.17.530(1)(a), like its predecessor, is unconstitutional on its face. Accordingly, we affirm the Court of Appeals decision to reverse the trial court's order affirming enforcement of RCW 42.17.530(1)(a) against respondent Marilou Rickert.
¶ 3 While other states have enacted statutes like RCW 42.17.530(1)(a),[2] and some courts have upheld these statutes,[3] such holdings should be neither admired nor emulated. The notion that the government, rather than the people, may be the final arbiter of truth in political debate is fundamentally at odds with the First Amendment. Because RCW 42.17.530(1)(a) rests on the validity of this erroneous assumption, it must be struck down.

FACTS AND PROCEDURAL HISTORY
¶ 4 In 2002, Ms. Rickert challenged incumbent Senator Tim Sheldon in the election for state senator from Washington's 35th Legislative District. During the campaign, Ms. Rickert sponsored a mailing that included a brochure comparing her positions to those of Senator Sheldon. In part, the brochure stated that Ms. Rickert "[s]upports social services for the most vulnerable of the state's citizens." Admin. Record (AR) at 10. By way of comparison, the brochure stated that Senator Sheldon "voted to close a facility for the developmentally challenged in his district." Id. In response to the latter statement, Senator Sheldon filed a complaint with the Public Disclosure Commission (PDC), alleging a violation of RCW 42.17.530(1)(a).
*828 ¶ 5 RCW 42.17.530(1) provides, in relevant part:
It is a violation of this chapter for a person to sponsor with actual malice:
(a) Political advertising or an electioneering communication that contains a false statement of material fact about a candidate for public office. However, this subsection (1)(a) does not apply to statements made by a candidate or the candidate's agent about the candidate himself or herself.
"Actual malice" means "to act with knowledge of falsity or with reckless disregard as to truth or falsity." RCW 42.17.020(1). A violation of RCW 42.17.530(1)(a) must be proven by clear and convincing evidence. RCW 42.17.530(2).
¶ 6 The PDC held a hearing regarding Senator Sheldon's complaint on July 29, 2003, months after Senator Sheldon handily defeated Ms. Rickert in the 2002 election. See Rickert v. Pub. Disclosure Comm'n, 129 Wash.App. 450, 453, 119 P.3d 379 (2005) (noting that "Senator Sheldon was reelected . . . by approximately 79 percent of the vote"). The PDC found that Ms. Rickert's brochure contained two false statements: "(a) Senator Sheldon voted to close the Mission Creek Youth Camp, and (b) . . . Mission Creek was a facility for the developmentally challenged." AR at 410 (Final Order, Conclusion of Law 7).[4] Additionally, the PDC concluded that the statements were material, that Ms. Rickert sponsored the brochure with actual malice, and that her violation of RCW 42.17.530(1)(a) had been established by clear and convincing evidence. AR at 411 (Final Order, Conclusion of Law 10). The PDC imposed a $1,000 penalty on Ms. Rickert. AR at 411 (Final Order).
¶ 7 The superior court affirmed the PDC's final order. Ms. Rickert then appealed to the Court of Appeals, which reversed. The Court of Appeals held that RCW 42.17.530(1)(a) violates the First Amendment because it cannot survive strict scrutiny. Rickert, 129 Wash.App. 450, 119 P.3d 379. We agree and, accordingly, affirm.

ANALYSIS
A. RCW 42.17.530(1)(a) extends to protected speech, hence, strict scrutiny applies
¶ 8 "`[T]he First Amendment `has its fullest and most urgent application' to speech uttered during a campaign for political office.'" Burson v. Freeman, 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) (quoting Eu v. S.F. County Democratic Cent. Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)). Such political speech is "`at the core of our First Amendment freedoms.'" Republican Party v. White, 536 U.S. 765, 774, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (quoting Republican Party v. Kelly, 247 F.3d 854, 861, 863 (8th Cir.2001)). Accordingly, any statute that purports to regulate such speech based on its content is subject to strict scrutiny. Id.; Burson, 504 U.S. at 198, 112 S.Ct. 1846 (state's content-based regulation of political speech subject to strict scrutiny); 119 Vote No! Comm., 135 Wash.2d at 628, 957 P.2d 691; Rickert, 129 Wash.App. at 452, 119 P.3d 379.[5] Under this standard, the State must demonstrate that RCW 42.17.530(1)(a) "`is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" Burson, 504 U.S. at 198, 112 S.Ct. 1846 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).
¶ 9 The text of RCW 42.17.530(1)(a) suggests that the legislature may have intended to limit the scope of its prohibition to the unprotected category of political defamation speech identified by the United States Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). However, as correctly noted by the Court of Appeals, "[U]nder New York Times, only defamatory statements . . . are not constitutionally protected speech." Rickert, 129 Wash.App. at 461, 119 P.3d 379. Because RCW 42.17.530(1)(a) does not require *829 proof of the defamatory nature of the statements it prohibits, its reach is not limited to the very narrow category of unprotected speech identified in New York Times and its progeny. Thus, RCW 42.17.530(1)(a) extends to protected political speech and strict scrutiny must apply.
B. RCW 42.17.530(1)(a) cannot survive strict scrutiny
1. Protecting candidates is not a compelling government interest here, and RCW 42.17.530(1)(a) is not narrowly tailored to further that interest
¶ 10 The plain language of RCW 42.17.530(1)(a) provides that the law's purpose is "to provide protection for candidates for public office." LAWS of 1999, ch. 304, § 1(3). Legislators apparently concluded this was a sufficient state interest to support the statute based on the concurring opinion of Justice Madsen in 119 Vote No! Committee, 135 Wash.2d at 635-36, 957 P.2d 691 (Madsen, J., concurring). Laws of 1999, ch. 304, § 1. The present case provides an opportunity to reiterate the fundamental principles enunciated by the lead opinion in 119 Vote No! Committee, 135 Wash.2d 618, 957 P.2d 691, and to clarify that neither statements about political issues nor those about candidates may be censored by the government under a scheme like RCW 42.17.530(1)(a).
¶ 11 In the case at bar, as in 119 Vote No! Committee, the State claims that "it may prohibit false statements of fact contained in political advertisements." 135 Wash.2d at 624, 957 P.2d 691. However, "[t]his claim presupposes the State possesses an independent right to determine truth and falsity in political debate," a proposition fundamentally at odds with the principles embodied in the First Amendment. Id. at 624-25, 957 P.2d 691. Moreover, it naively assumes that the government is capable of correctly and consistently negotiating the thin line between fact and opinion in political speech. Yet, political speech is usually as much opinion as fact.[6] As aptly summarized by the Supreme Court, quoted by the lead opinion in 119 Vote No! Committee, "`[E]very person must be his own watchman for truth, because the forefathers did not trust any government to separate the truth from the false for us.'" Id. at 625, 957 P.2d 691 (internal quotation marks omitted) (quoting Meyer, 486 U.S. at 419-20, 108 S.Ct. 1886).
¶ 12 Particularly relevant here is the fundamental First Amendment principle forbidding censorship or coerced silence in the context of political debate. "The First Amendment exists precisely to protect against laws . . . which suppress ideas and inhibit free discussion of governmental affairs." Id. at 627, 957 P.2d 691; see also White, 536 U.S. at 774, 122 S.Ct. 2528 (political speech is "`at the core of our First Amendment freedoms'" (quoting Kelly, 247 F.3d at 861)). Hence, the Sedition Act of 1798, which censored speech about government, has been subject to nearly unanimous historical condemnation. See, e.g., New York Times, 376 U.S. at 274, 84 S.Ct. 710. For similar reasons, RCW 42.17.530(1)(a) is deserving of condemnation, lacks a compelling justification, and thus must be declared unconstitutional.
¶ 13 In her concurrence in 119 Vote No! Committee, Justice Madsen appeared to suggest (in dicta) that while false statements in political speech about issues may not be constitutionally prohibited, the State may prohibit such statements about candidates. 135 Wash.2d at 635, 957 P.2d 691 (Madsen, J., concurring). This was not an accurate statement of the law to the extent that it suggested nondefamatory, false statements about candidates may be prohibited.[7] More importantly, *830 in light of the heightened protections for political speech afforded by the First Amendment, there simply cannot be any legitimate, let alone compelling, interest in permitting government censors to vet and penalize political speech about issues or individual candidates.
¶ 14 The Supreme Court has recognized a legitimate, and at times compelling, interest in "compensating private individuals for wrongful injury to reputation." Gertz v. Robert Welch, Inc., 418 U.S. 323, 348, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). However, this interest cannot justify a government-enforced censorship scheme like RCW 42.17.530(1)(a). See 119 Vote No! Comm., 135 Wash.2d at 630, 957 P.2d 691 ("RCW 42.17.530(1)(a) restricts political speech absent the compelling interest present in defamation cases. . . ."). Enforcement of RCW 42.17.530(1)(a) has nothing to do with "compensating private individuals for wrongful injury to reputation." Gertz, 418 U.S. at 348, 94 S.Ct. 2997. The statute may protect candidates from criticism, but it has no mechanism for compensation for damage to reputations. More importantly, there is no requirement that the statements subject to sanction under RCW 42.17.530(1)(a) be of the kind that tend to cause harm to an individual's reputation, i.e., defamatory.[8] Ultimately, the statute bears no relationship to the reputational interests that Justice Madsen considered in suggesting that former RCW 42.17.530(1)(a) might be valid as applied to speech about candidates. 119 Vote No! Comm., 135 Wash.2d at 635-36, 957 P.2d 691 (Madsen, J., concurring).
¶ 15 In sum, the interest asserted by the legislature  protecting political candidates (including themselves)  is not a compelling interest in support of RCW 42.17.530(1)(a). Accordingly, the statute fails under strict scrutiny.
¶ 16 Moreover, even assuming that protection of political candidates could be a compelling interest, RCW 42.17.530(1)(a) would still be unconstitutional because there is no requirement that the prohibited statements tend to be harmful to a candidate's reputation, i.e., defamatory. Thus, the statute is not narrowly tailored to serve the State's asserted interest in protecting candidates.
2. Preserving the integrity of elections is not a compelling government interest here, and RCW 42.17.530(1)(a) is not narrowly tailored to further that interest
¶ 17 At argument below and before this court, the PDC suggests that preserving the integrity of the election process is the primary government interest furthered by RCW 42.17.530(1)(a). However, this was not the interest asserted by the legislature in enacting RCW 42.17.530(1)(a). LAWS of 1999, ch. 304, § 1, quoted supra p. 6. Under strict scrutiny, a law burdening speech may not be upheld for any conceivable purpose but must be evaluated according to its actual purpose. Thus, it is arguably inappropriate to even consider the PDC's argument based on this belated, alternative interest.
¶ 18 Even assuming it were proper to consider a state interest asserted for the first time at argument, the PDC's claim still fails. The government may have a compelling interest in preventing direct harm to elections. See, e.g., Burson, 504 U.S. at 199, 112 S.Ct. 1846 (recognizing states' compelling interest in "`preserving the integrity of its election process'" by protecting the election poll area (quoting Eu, 489 U.S. at 231, 109 S.Ct. 1013)); Munro v. Socialist Workers Party, 479 U.S. 189, 195, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (recognizing states' compelling interest in avoiding voter confusion through *831 avoiding ballot overcrowding by multiple candidates with little support). However, that interest is not advanced in any significant manner by prosecuting Ms. Rickert, and other similarly situated individuals, under RCW 42.17.530(1)(a). Rather, the PDC's claim that it must prohibit arguably false, but nondefamatory, statements about political candidates to save our elections conflicts with the fundamental principles of the First Amendment. See supra Part B.1. Therefore, "preserving the integrity of the election process" cannot be deemed a compelling interest in the context of a scheme like RCW 42.17.530(1)(a).
¶ 19 Furthermore, even if such an interest were valid, RCW 42.17.530(1)(a) would remain unconstitutional because it is not narrowly tailored. The statute is underinclusive because it does not apply to many statements that pose an equal threat to the State's alleged interest in protecting elections. Specifically, the statute exempts all statements made by a candidate (or his supporters) about himself. RCW 42.17.530(1)(a). Basically, a candidate is free to lie about himself, while an opponent will be sanctioned. Yet, "[t]he PDC presents no compelling reason why a candidate would be less likely to deceive the electorate on matters concerning him- or herself and [thus] compromise the integrity of the elections process." Rickert, 129 Wash.App. at 466, 119 P.3d 379.
¶ 20 This exemption cannot be justified as an example of the legislature choosing to focus on a particularly egregious form of unprotected speech. Cf. Virginia v. Black, 538 U.S. 343, 363, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (upholding state statute criminalizing cross burning with intent to intimidate, in part, because proscribed conduct constituted "particularly virulent form of" a threat). Because the entire class of speech at issue is not proscribable, see supra Part A., the reasoning from cases like Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535, and R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), is inapplicable. Additionally, the very existence of the exemption for self-related speech undermines the legitimacy of the State's asserted interest. See City of Ladue v. Gilleo, 512 U.S. 43, 52, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (noting that exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place"). This exemption suggests that the interest proffered by the legislature  protecting candidates (including themselves)  is the true interest behind this law, not protection of the electoral process.
¶ 21 In sum, RCW 42.17.530(1)(a)'s exemption for candidates' false speech about themselves demonstrates that the statute is not narrowly tailored to serve the State's alleged interest in preserving the integrity of elections. See ACLU v. Heller, 378 F.3d 979, 996-97 (9th Cir.2004) (finding Nevada law proscribing anonymous campaign speech not narrowly tailored to further state's interest in fraud prevention because, among other things, the statute contained exceptions for communications by candidates and political parties). Because RCW 42.17.530(1)(a) is not narrowly tailored, the statute cannot survive under strict scrutiny.
3. The faulty procedural mechanisms of RCW 42.17.530(1)(a) confirm that the law is not narrowly tailored and, thus, fails under strict scrutiny
¶ 22 RCW 42.17.530(1)(a) is also fatally flawed due to its enforcement procedures, which are likely to have a chilling effect on speech. These procedural defects further indicate that the statute is not the least restrictive alternative to achieve the compelling interests it allegedly furthers. Ultimately, these defects support the conclusion that any statute permitting censorship by a group of unelected government officials is inherently unconstitutional.
¶ 23 The members of the PDC, the administrative body that enforces RCW 42.17.530(1)(a), are appointed by the governor, a political officer. See RCW 42.17.350(1). This group of unelected individuals is empowered not only to review alleged false statements made in political campaigns but also to impose sanctions. See WAC 390-37-100. Finally, there is no requirement that a reviewing court conduct an independent, de novo review as to whether there is clear and convincing evidence the *832 respondent uttered the statements with actual malice.[9]Cf. Bose Corp. v. Consumers Union, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (holding that, under the standard of New York Times, "[a]ppellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity").
¶ 24 The chilling effects resulting from this procedural scheme are manifest. A sitting governor may appoint a majority of the PDC's members. When this same governor seeks reelection, the governor's own appointees will decide whether to sanction the speech of campaign opponents. The campaign opponents will not be guaranteed a jury trial or independent, de novo judicial review. The mere threat of such a process will chill political speech. Likewise, the prospect of such a proceeding justifiably undermines the public's confidence in the propriety of Washington's electoral process-the very interest which the PDC purports to serve. Because of the risks to liberty inherent in RCW 42.17.530(1)(a)'s enforcement mechanisms, the statute cannot survive strict scrutiny.

CONCLUSION
¶ 25 Our constitutional election system already contains the solution to the problem that RCW 42.17.530(1)(a) is meant to address. "In a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent. The preferred First Amendment remedy of `more speech, not enforced silence,' thus has special force." Brown v. Hartlage, 456 U.S. 45, 61, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) (quoting Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)). In other words, the best remedy for false or unpleasant speech is more speech, not less speech. The importance of this constitutional principle is illustrated by the very real threats to liberty posed by allowing an unelected government censor like the PDC to act as an arbiter of truth. See supra Part B.2.
¶ 26 In the case at bar, Ms. Rickert made knowingly false or reckless statements about Senator Sheldon, a man with an outstanding reputation. Senator Sheldon and his (many) supporters responded to Ms. Rickert's false statements with the truth. As a consequence, Ms. Rickert's statements appear to have had little negative impact on Senator Sheldon's successful campaign and may even have increased his vote. See Rickert, 129 Wash.App. at 453, 119 P.3d 379 (noting that "Senator Sheldon was reelected . . . by approximately 79 percent of the vote."). Were there injury to Senator Sheldon's reputation, compensation would be available through a defamation action. As it is, Ms. Rickert was singled out by the PDC for punishment, six months after the election, based on statements that had no apparent impact on the government interests allegedly furthered by the statute. That the statute may be applied in such a manner proves that it is fatally flawed under the First Amendment.
¶ 27 There can be no doubt that false personal attacks are too common in political campaigns, with wide-ranging detrimental consequences. However, government censorship such as RCW 42.17.530(1)(a) is not a constitutionally permitted remedy. We hold that this statute, which allows a government agency to censor political speech, is unconstitutional and affirm the decision of the Court of Appeals.
WE CONCUR: CHARLES W. JOHNSON, SUSAN OWENS, RICHARD B. SANDERS., JJ.
ALEXANDER, C.J. concurring.
¶ 28 In my view, the majority goes too far in concluding that any government censorship of political speech would run afoul of the First Amendment to the United States Constitution. The United States Supreme Court has ruled that defamation is not protected by the First Amendment. Bose Corp. v. Consumers *833 Union of U.S., Inc., 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Beauharnais v. Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952). The government, thus, may penalize defamatory political speech. The statute at issue here, however, prohibits nondefamatory speech in addition to defamatory speech. Thus, I concur in the majority's conclusion that RCW 42.17.530(1)(a) is unconstitutionally overbroad.
MADSEN, J. dissenting.
¶ 29 The impression left by the majority's rhetoric, that oppressive government regulation is at issue in this case, is simply wrong. When cases decided by the United States Supreme Court are properly applied, it is obvious that RCW 42.17.530(1)(a) infringes on no First Amendment rights.
¶ 30 Unfortunately, the majority's decision is an invitation to lie with impunity. The majority opinion advances the efforts of those who would turn political campaigns into contests of the best stratagems of lies and deceit, to the end that honest discourse and honest candidates are lost in the maelstrom. The majority does no service to the people of Washington when it turns the First Amendment into a shield for the "unscrupulous . . . and skillful" liar to use knowingly false statements as an "effective political tool" in election campaigns. See Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). It is little wonder that so many view political campaigns with distrust and cynicism.
¶ 31 The majority is wrong when it says that state government cannot constitutionally regulate truth or falsity of political speech. No such blanket rule exists under the First Amendment, and no such blanket rule was ever agreed to by a majority of this court in State ex rel. Public Disclosure Commission v. 119 Vote No! Committee, 135 Wash.2d 618, 957 P.2d 691 (1998). There is no question that the First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). But it is equally true that the use of calculated falsehood is not constitutionally protected. "Neither the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues.'" Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (quoting New York Times, 376 U.S. at 270, 84 S.Ct. 710).
¶ 32 The United States Supreme Court has made it absolutely clear that the deliberate lie in political debate has no protected place under the First Amendment because such lies do not advance the free political process but rather subvert it:
At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected.
Garrison, 379 U.S. at 75, 85 S.Ct. 209 (emphasis added) (citation omitted).
¶ 33 The majority's premise that there can be no regulation of political speech whatsoever cannot be squared with the United States Supreme Court's conclusion that under the First Amendment:

Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ." Chaplinsky v. New Hampshire, 315 U.S. 568, 572[, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)]. Hence the knowingly false statement and the false statement made with reckless disregard of *834 the truths do not enjoy constitutional protection.
Id. at 75, 85 S.Ct. 209 (emphasis added).
¶ 34 The majority is also wrong when it asserts that the only time that a false statement about a candidate for office can be burdened is when the statement constitutes civil defamation, actionable in tort law. This premise is no more accurate than the majority's conclusion that government cannot regulate political speech by proscribing the known lie.
¶ 35 The "actual malice" standard, under which false statements made with actual malice, that is, with knowledge of their falsity or reckless disregard as to truth or falsity, are not protected speech applies in contexts other than civil defamation suits. The United States Supreme Court has not restricted the standard to civil defamation and, most notably, has applied it to a criminal prosecution. The majority's conclusion cannot be reconciled with decisions of the Court having the final authority on the meaning of the First Amendment.
¶ 36 Because the majority declines to follow precedent holding that false statements under the actual malice standard are not protected speech, it engages in a strict scrutiny analysis of RCW 42.17.530(1)(a)'s constitutionality. However, if the actual malice standard is met the speech falls within a class of speech that is not constitutionally protected. Therefore, a statute that proscribes speech under this standard does not have to meet the strict scrutiny/compelling governmental interest test that applies to statutes regulating protected political speech.
¶ 37 Further, the majority refuses to recognize that the actual malice standard is an exceedingly high standard to meet. Most political speech does not even approach being subject to regulation under this standard; the standard prohibits only the very worst untruths  those made with knowledge of their falsity or with reckless disregard to truth or falsity. In addition, the burden of proof is also high  proof must be by clear and convincing evidence. The actual malice standard is deliberately difficult to satisfy, precisely because free speech rights are at issue. Therefore, much nuanced speech, and all speech that constitutes opinion rather than fact, will simply fall short of it.
¶ 38 Finally, while the majority would prefer that no entity have authority to make final decisions on whether speech may be regulated and whether any regulations that are enacted conform to First Amendment requirements, this authority is constitutionally vested in the courts. Under RCW 42.17.530(1) the courts will continue to act as the final arbiter of any administrative decision.
¶ 39 Ultimately, the majority's claim of government censorship does not reflect the statute or the legislature's attempt to prohibit unprotected speech. Accordingly, I dissent.

ANALYSIS
¶ 40 Fundamentally, the majority ignores the fact that the actual malice standard is based on two vital principles under the First Amendment. The first is that free political expression is so prized in our system of self-governance that, as to matters of public concern, including matters of self-governance such as the election of those who will represent the people, some false speech must necessarily be protected. A speaker attempting to persuade others to his or her point of view may "`resort[] to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.'" New York Times, 376 U.S. at 271, 84 S.Ct. 710 (quoting Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). These "`liberties'" are necessary "`to enlightened opinion and right conduct on the part of the citizens of a democracy.'" Id. Therefore, "erroneous statement is inevitable in free debate" and "it must be protected if the freedoms of expression are to have the `breathing space' . . . `need[ed] . . . to survive.'" New York Times, 376 U.S. at 271-72, 84 S.Ct. 710 (third alteration in original) (quoting Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Thus, we depend upon more speech, not less, to arrive at truth.
*835 ¶ 41 Nonetheless, while "there is no such thing as a false idea" under our Constitution, Gertz, 418 U.S. at 339, 94 S.Ct. 2997 (emphasis added), "there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Among these categories is the false statement of fact. Thus, the second principle that serves as a foundation for the actual malice standard is that "`there is no constitutional value in false statements of fact.'" Id. at 504 n. 22, 104 S.Ct. 1949 (emphasis added) (quoting Gertz, 418 U.S. at 340, 94 S.Ct. 2997).
¶ 42 "Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity." Garrison, 379 U.S. at 75, 85 S.Ct. 209. The Court has repeatedly held that false statements made with actual malice are not constitutionally protected. E.g., Gertz, 418 U.S. at 340, 94 S.Ct. 2997 ("[n]either the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues" (quoting New York Times, 376 U.S. at 270, 84 S.Ct. 710)); Bill Johnson's Rests., Inc. v. Nat'l Labor Relations Bd., 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("false statements are not immunized by the First Amendment right to freedom of speech"); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality) ("[c]alculated falsehood, of course, falls outside `the fruitful exercise of the right of free speech,'" (quoting Garrison, 379 U.S. at 75, 85 S.Ct. 209) overruled on other grounds by Gertz, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789); Time, Inc. v. Hill, 385 U.S. 374, 389-90, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ("[b]ut the constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function"); St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("[n]either lies nor false communications serve the ends of the First Amendment"); Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 63, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) ("the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth").
¶ 43 The actual malice standard thus accommodates both the "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times, 376 U.S. at 270, 84 S.Ct. 710, and the premise that "there is no constitutional value in false statements of fact," Gertz, 418 U.S. at 340, 94 S.Ct. 2997. To give effect to both principles, the actual malice standard protects a great deal of false speech, providing the necessary "breathing space" for free political speech and the unfettered exchange of ideas. Thus, the innocent or negligent false statement is protected in order to provide the necessary breathing space. But the actual malice standard does not permit the knowing lie, or the lie made with reckless disregard of its falsity  thus giving effect to the precept that there is no constitutional value in false statements of fact in and of themselves.
¶ 44 A statement is made with actual malice if it is made with knowledge of its falsity or with reckless disregard for truth or falsity. New York Times, 376 U.S. at 279-80, 84 S.Ct. 710. The test is a subjective test, with "reckless disregard" meaning a "subjective awareness of probable falsity: `[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" Gertz, 418 U.S. at 334 n. 6, 94 S.Ct. 2997 (quoting St. Amant, 390 U.S. at 731, 88 S.Ct. 1323). Actual malice must be proven by clear and convincing evidence. New York Times, 376 U.S. at 285-86, 84 S.Ct. 710.
¶ 45 RCW 42.17.530(1)(a) incorporates these constitutional standards and therefore does not abridge freedom of speech. The statute provides:
(1) It is a violation of this chapter for a person to sponsor with actual malice:
(a) Political advertising . . . that contains a false statement of material fact about a candidate for public office. However, this subsection (1)(a) does not apply to statements made by a candidate or the *836 candidate's agent about the candidate himself or herself.[[1]]
¶ 46 "Actual malice" means "to act with knowledge of falsity or with reckless disregard as to truth or falsity." RCW 42.17.020(1). A violation of RCW 42.17.530(1)(a) must be proven by clear and convincing evidence. RCW 42.17.530(2).
¶ 47 The majority reasons, though, that the elements of a defamation action are prerequisites to finding speech unprotected under New York Times standard. Decisions by the United States Supreme Court show that this is not true. The New York Times standard has been applied outside the context of civil defamation suits. As one court accurately summarized, "calculated falsehoods are of such slight social value that no matter what the context in which they are made, they are not constitutionally protected." Vanasco v. Schwartz, 401 F.Supp. 87, 93 (E.D.N.Y.1975). There is no requirement that all the elements of a defamation cause of action, specifically damages, must be proven. If the speech falls within the actual malice standard, it is unprotected speech.
¶ 48 For example, in Brown v. Hartlage, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), the Court found unconstitutional as applied a Kentucky law that provided a candidate for public office had to forfeit his office if he erred in stating that he would, if elected, serve at a reduced salary. Forfeiture was required even though the statement was made in good faith and promptly repudiated. The Court addressed three possible justifications for the statute's application, the third of which was "as an application of the State's interests and prerogatives with respect to factual misstatements." Id. at 54, 102 S.Ct. 1523. The Court observed that "demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements." Id. at 60, 102 S.Ct. 1523. However, as in its other decisions, the Court also emphasized the need for adequate breathing space for freedoms of expression necessitating some erroneous statement. Id. "[A]bsolute accountability for factual misstatements in the course of political debate" produces a "chilling effect" that is "incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns." Id. at 61, 102 S.Ct. 1523.
¶ 49 The Court then noted that "[a]lthough the state interest in protecting the political process from distortions caused by untrue and inaccurate speech is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount." Id. (emphasis added). When compatible with the interest that is involved, "`we depend for . . . correction not on the conscience of judges and juries but on the competition of other ideas.'" Id. (alteration in original) (quoting Gertz, 418 U.S. at 339-40, 94 S.Ct. 2997). The preferred remedy is generally more speech, not enforced silence. Brown, 456 U.S. at 61, 102 S.Ct. 1523.
¶ 50 The Court observed that there was no showing that the candidate had made the disputed statement about foregoing his salary other than in good faith and without knowledge of its falsity and without reckless disregard as to falsity, and he retracted it when he discovered it might be false. Accordingly, the Court reasoned that applying the statute to nullify his "election victory was inconsistent with the atmosphere of robust political debate protected by the First Amendment." Id. at 61-62, 102 S.Ct. 1523. By using the actual malice standard to test the constitutionality of the election statute, the Court showed that the actual malice standard is not limited to defamation actions.
¶ 51 In Garrison, the Court applied the actual malice standard in a case involving an action by the government against an individual  a prosecution for criminal defamation under a Louisiana statute that did not require proof of damages. Garrison, 379 U.S. at 65 n. 1, 85 S.Ct. 209. The Court addressed the issue "whether, in view of the differing history and purposes of criminal libel, the New York Times rule also limits state power *837 to impose criminal sanctions for criticism of the official conduct of public officials." Id. at 67, 85 S.Ct. 209. The Court said the reasons that led to the holding in New York Times
apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the `breathing space' that they `need . . . to survive' . . .," [New York Times], 376 U.S., at 271-272, only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions.

Garrison, 379 U.S. at 74, 85 S.Ct. 209 (emphasis added) (alterations in original).
¶ 52 The actual malice standard for determining when speech is constitutionally protected has also been applied in a case involving a wrongful dismissal action brought by a public school teacher alleging he was unconstitutionally dismissed for making false statements in discussing issues of public concern, Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and to a suit for invasion of privacy based on false statements where a matter of public concern was involved, Time, Inc., 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456.
¶ 53 The importance of New York Times and other defamation cases decided by the United States Supreme Court involving public officials and public figures is that in these cases the Court explained the constitutional principles that also apply when determining whether a state law constitutionally regulates false statements during a political campaign. But these defamation cases do not hold or even suggest that the actual malice standard does not apply in other contexts. As the Court said in Garrison, 379 U.S. at 75, 85 S.Ct. 209 (quoting Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766), lies about public officials are clearly outweighed by "`the social interest in order and morality.'" It follows that lies about candidates during a campaign for public office are of the same nature. A deliberately made false statement is not constitutionally protected merely because it is made in the course of a political campaign. Vanasco, 401 F.Supp. at 91-92; see Garrison, 379 U.S. at 75, 85 S.Ct. 209. Fundamentally, the government has a compelling and legitimate interest in preserving the integrity of the election process. Eu v. S.F. County Democratic Cent. Comm., 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989); see Brown, 456 U.S. at 61, 102 S.Ct. 1523 (recognizing "the state interest in protecting the political process from distortions caused by untrue and inaccurate speech"); Vanasco, 401 F.Supp. at 100 ("[u]ndoubtedly, deliberate calculated falsehoods when used by political candidates can lead to public cynicism and apathy toward the electoral process"); Snortland v. Crawford, 306 N.W.2d 614, 623 (N.D.1981) ("[u]ndoubtedly, the State interest in preserving the integrity of the election process and allowing the electorate to choose among candidates on the basis of accurate information is of paramount importance," subject to the requirement of a stringent mental culpability requirement). A state may adopt "`generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process.'" U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 834, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).
¶ 54 The calculated falsehood in the course of an election campaign can distort the electoral process by misinforming the voters and so interfere with the process "upon which democracy is based." William P. Marshall, False Campaign Speech and the First Amendment, 153 U. PA. L.REV. 285, 294 (2004). As Marshall notes, and quoted above, using the known lie as a tool is at odds with the premises of democratic government and the orderly way in which change is to be effected. Id. (citing Garrison, 379 U.S. at 75, 85 S.Ct. 209). False statements can lower the quality of campaign discourse and debate, generating response to the attacks *838 rather than engagement on major issues. Marshall, supra, at 294. False advertising also may give rise to or exacerbate voter alienation and distrust of the political process. Id. at 295.
¶ 55 And, as the concurrence in 119 Vote No! suggested, "a law prohibiting a person from sponsoring with actual malice political advertising containing false statements of material fact about a candidate for public office" implicates the "societal interest in individual reputations." 119 Vote No!, 135 Wash.2d at 635-36, 957 P.2d 691 (Madsen, J., concurring). The harm that results from false statements about an opponent can include reputational injury on the part of the individual who is attacked. Marshall, supra, at 296. But in addition, where these attacks are allowed, this type of harm can also deter qualified persons from seeking political office, resulting in harm to the democratic community. Id.
¶ 56 In light of these interests, there is no reason to treat the calculated falsehood with any greater protection in the context of a campaign than the Court said is constitutionally required in a defamation action involving a public official or public figure and a matter of public concern, or in the other contexts where it has applied the standard. These interests justify the actual malice standard in the context of political campaigns. They also warrant the conclusion that the calculated lie about a candidate for office during an election campaign is not subject to correction only through more speech or only through private defamation actions. As both Brown and Garrison indicate, such speech may be constitutionally regulated.
¶ 57 Since New York Times was decided, a number of states have enacted measures that incorporate the actual malice test; some of these statutes were amended following invalidation of former versions found not to meet the New York Times standard. See, e.g., COLO.REV.STAT. ANN. § 1-13-109 (LexisNexis) (violation is a misdemeanor); FLA. STAT. ANN. § 104.271 (West) (violator subject to civil penalty of up to $5,000); MINN.STAT. ANN. § 211B.06 (West) (violation is a gross misdemeanor); MONT.CODE ANN. § 13-37-131 (a violator is subject to liability in a civil action brought by the commissioner or county attorney for an amount up to $1,000); N.C. GEN.STAT. ANN. § 163-274(8) (LexisNexis); OHIO REV.CODE ANN. § 3517.21(B) (LexisNexis) (a violator is subject to a fine of not more than $5,000 or imprisonment of not more than six months, or both, pursuant to OHIO REV.CODE ANN. § 3517.992(V)); ORE. REV.STAT. § 260.532(1), (5), (8) (in addition to stating a cause of action for false statements made relating to a candidate, the statute provides that if judgment is rendered against one who has been nominated or elected to office (other than state senator or representative), and the finder of fact finds by clear and convincing evidence that the false statement reversed the outcome of the election, the defendant will be deprived of the nomination or office). Some states have more limited statutes, which punish only knowingly made false statements. E.g., ALASKA STAT. § 15.56.014 (a violation is a misdemeanor); MASS. GEN. ANN. LAW ch. 56, § 42 (West) ("[n]o person shall make or publish, or cause to be made or published, any false statement in relation to any candidate . . . which is designed or tends to aid or to injure or defeat such candidate"; a knowing violation is punishable by a fine of not more than $1,000 or imprisonment for not more than six months); TENN.CODE. ANN. § 2-19-142 (violation is a misdemeanor); Utah Code Ann. § 20A-11-1103 (LexisNexis); W. VA.CODE ANN. § 3-8-11 (LexisNexis) (violation is a misdemeanor punishable by a fine of not more than $10,000 or not more than one year in jail, or both); WIS. STAT. ANN. § 12.05 (West).[2]
¶ 58 In Pestrak v. Ohio Elections Commission, 926 F.2d 573 (6th Cir.1991), the court overturned the district court's holding that all parts of a former Ohio statute regulating *839 false statements during election campaigns were unconstitutional. The court rejected the argument that regardless how the statute was enforced it was unconstitutional because it distinguished among types of political speech based on its content, calling the argument "untenable." Id. at 577. The court explained that the subsection under which the individual complainant had been charged "punishes making a false statement either knowingly, or with reckless disregard as to its falsity. These portions of the statute clearly come within the Supreme Court's holdings in Garrison and New York Times" where the Court concluded that false political speech does not merit constitutional protection if the statements are made with actual malice. Id. (citations omitted). The court concluded that on its face the statute that the complainant had been charged under was directed at speech that is not constitutionally protected.
¶ 59 In a subsequent case, the court found that another portion of the same former Ohio statute unconstitutionally regulated speech based upon its implications and therefore reached more speech than declared unconstitutional in Garrison. Briggs v. Ohio Elections Comm'n, 61 F.3d 487, 494 (6th Cir. 1995).
¶ 60 A number of other courts have also invalidated various former state statutes prohibiting false political advertising precisely because they did not incorporate the actual malice standard. In State v. Burgess, 543 So.2d 1332, 1334 (La.1989), the court addressed former LA.REV.STAT. ANN. 18:1463(C)(1) (1977), which prohibited any person from anonymously disseminating any material "`containing any statement which makes scurrilous, false, or irresponsible adverse comment about a candidate for election.'" The state contended the statute did not violate constitutional standards since it forbade "anonymous false statements designed to mislead voters in an election." Burgess, 543 So.2d at 1335. The court disagreed with this characterization, emphasizing that "[t]he standard for constitutionally protected false speech in the context of public figures" is the New York Times standard of actual malice. Id. While the statute at issue applied to public figures by its nature, the word "false" used by the legislature did not conform to the constitutional standard and instead encompassed protected speech. The words "`scurrilous' and `irresponsible adverse comment' [were] so broad as to include both true speech and protected false speech about a candidate," rather than only unprotected false speech as the state claimed. Id. Because the actual malice standard was not used, the statute regulated protected speech; therefore, its regulation of speech had to satisfy the strict scrutiny constitutional standard. Id. at 1335-36.
¶ 61 The Minnesota Court of Appeals invalidated a former version of that state's statute which criminalized intentional participation in paid political advertising or use of campaign materials regarding the personal or political character of a candidate, or the candidate's acts, which "`the person knows or has reason to believe is false and that is designed or tends to elect, injure, or defeat a candidate.'" State v. Jude, 554 N.W.2d 750, 753 (Minn.App.1996) (bold omitted) (quoting former MINN.STAT. § 211B.06(1) (1988)). Calling the New York Times actual malice standard "plainly the pattern to which the statute must be trimmed," the court said that a criminal sanction cannot be imposed for political speech that does not meet that standard. Jude, 554 N.W.2d at 754. The court held that the statute was unconstitutionally overbroad because the "reason to believe" language in the Minnesota statute departed from the "reckless disregard" component of the actual malice standard and extended the statute's prohibition to constitutionally protected statements. Id.
¶ 62 In Vanasco, a panel of three federal judges held that challenged sections of a former New York statute and fair campaign code were unconstitutional on their face because they did not conform to the New York Times actual malice standard. The provisions prohibited political advertisements or other writings, speeches, etc. during a campaign for nomination or election that "`misrepresent[ed] any candidate's qualifications' including the use of `personal vilification' and `scurrilous attacks'; any `misrepresentation of a candidate's position'; and any `misrepresentation *840 of any candidate's party affiliation or party endorsement.'" Vanasco, 401 F.Supp. at 88 (citations omitted) (quoting provisions).
¶ 63 In Montana, a former statute provided that it was "`unlawful for a person to willfully or negligently make or publish a false statement about a candidate's public voting record or to make or publish a false statement that reflects unfavorably upon a candidate's character or morality'" or to "`willfully or negligently provide false information to a candidate concerning another candidate's public voting record when the person knows or should know that the information will be made public during the course of a campaign.'" Mont. Right to Life Ass'n v. Eddleman, 999 F.Supp. 1380, 1383 (D.Mont.1998) (quoting former MONT.CODE ANN. § 13-37-131(1), (2) (1995)), appealed on other grounds and aff'd, 343 F.3d 1085 (9th Cir.2003). The appellate court held that the statute unconstitutionally burdened political speech insofar as it prohibited negligent false statements and otherwise failed to satisfy the New York Times standard. Montana Right to Life, 999 F.Supp. at 1385 (showing redaction of offending portions of statute).
¶ 64 In a similar vein, under a former version of Hawaii's statute a candidate who agreed to adhere to the state's Code of Fair Campaign Practices and then breached it was subject to censure by the Hawaii Campaign Spending Commission. Former HAN. REV.STAT. § 11-193(a)(16) (2004). The Federal District Court of Hawaii addressed a censured candidate's First Amendment challenge to provisions of this law, which stated that the candidate would "`refrain from the use of personal vilification, character defamation, or any other form of scurrilous personal attacks on any candidate or his family'" and would "`not use campaign material relating to any candidate's election which misrepresents, distorts, or otherwise falsifies the facts regarding the candidate.'" Ancheta v. Watada, 135 F.Supp.2d 1114, 1117 (D.Haw.2001) (quoting provisions 2 and 3 of the Code of Fair Campaign Practices).
¶ 65 The court first noted that generally defamatory speech is not protected speech under the First Amendment, but in the case of speech by public officials on "matters of public concern and political discourse" the actual malice standard must be satisfied before the speech will fall within this class of unprotected speech. Ancheta, 135 F.Supp.2d at 1122. "[W]ithout such a rule, speakers would be chilled in criticizing or otherwise commenting on matters of their own governance." Id. However, the challenged provisions were not limited to statements that were made knowing they were false, or made with reckless disregard as to truth or falsity, as is required to meet the New York Times actual malice standard.[3] The district court accordingly concluded that the provisions regulated protected rather than unprotected speech and, after engaging in a strict scrutiny analysis, held that the statute was unconstitutional both as applied and facially.
¶ 66 As do these courts, I believe that the actual malice standard is both a necessary and a sufficient standard for regulating false campaign speech. Because "it is essential that the First Amendment protect some erroneous publications as well as true ones" in order to fully effectuate the rights set forth, St. Amant, 390 U.S. at 732, 88 S.Ct. 1323 lies may be prohibited only under the very high New York Times standard. Accord Garrison, 379 U.S. at 74, 85 S.Ct. 209; see Vanasco, 401 F.Supp. at 93 (regulation of speech of public figures "during campaigns for political office where the constitutional guarantee of freedom of speech `has its fullest and most urgent application'" must be subject to no less than the New York Times actual malice standard) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)). Just as no greater standard than the actual malice standard is required when assessing whether false statements are unprotected by the First Amendment, no lesser standard may be used, either. "[N]either the defense of truth nor the standard of ordinary care would prevent self-censorship and the subversion *841 of First Amendment policies." Snortland, 306 N.W.2d at 623. That protective standard is present here.
¶ 67 It is noteworthy that this court has previously upheld the constitutionality of a provision in the former Washington Code of Professional Conduct prohibiting a lawyer from knowingly making false statements of fact about the qualifications of a candidate for election or appointment to a judicial office, or false accusations against a judge or other adjudicatory officer. In re Discipline of Donohoe, 90 Wash.2d 173, 180, 580 P.2d 1093 (1978). While observing that a person does not surrender free speech rights when becoming licensed as an attorney, the court also concluded that the First Amendment does not protect utterance of a statement with knowledge that it is false, even during a judicial campaign. Id. at 181, 580 P.2d 1093. Importantly, the court observed that such speech is not beneficial to the public and generally is harmful to the person against whom the statements are made. Id.
¶ 68 In sum, RCW 42.17.530(1)(a) prohibits false statements of facts that are material to the election campaign. By limiting the statute's reach to facts, the legislature has avoided unconstitutionally infringing on opinions and ideas. The statute requires that the false statement be sponsored with actual malice, defined to mean to act with knowledge of the falsity or with reckless disregard as to truth or falsity. RCW 42.17.020(1). It requires proof by clear and convincing evidence, thus meeting the constitutional standard of convincing clarity. New York Times, 376 U.S. at 285-86, 84 S.Ct. 710.
¶ 69 The majority, however, finds constitutional infirmity in the fact that the statute does not apply to statements made by a candidate, or his or her agent, about the candidate. In the course of its erroneous strict scrutiny analysis the majority agrees with Ms. Rickert's contention that the statute is not narrowly tailored because it does not apply to such statements.
¶ 70 The Court has noted several times with regard to regulations with First Amendment implications that "`reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" McConnell v. Fed. Election Comm'n, 540 U.S. 93, 207-08, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (upholding certain parts of the McCain-Feingold Bill regulating campaign contributions) (quoting Buckley v. Valeo, 424 U.S. 1, 105, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)); see also Virginia v. Black, 538 U.S. 343, 363, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (addressing a statute that prohibited cross burning with intent to intimidate; state could outlaw such acts without prohibiting all intimidating messages).
¶ 71 Ms. Rickert maintains, however, that by penalizing false statements made about candidates but not those made by the candidates themselves, the statute runs afoul of the principle that a statute cannot proscribe speech on the basis of one content element that is unprotected if it additionally proscribes speech on the basis of other content elements, and the majority agrees. For example, the Court in R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 384, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), pointed out that "the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government." This principle does not apply here. The Court further explained:
When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class. To illustrate: A State might choose to prohibit only that obscenity which is the most patently offensive in its prurience  i.e., that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive political messages. And the Federal Government can criminalize only those threats of violence that are directed against the President since the reasons why threats of violence are outside *842 the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President. But the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities. . . . [Finally], a State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.
Id. at 388-89, 112 S.Ct. 2538 (citations omitted). As the Court said, the constitutional infirmity arises only where the proscribed category of speech is made a "vehicle[ ] for content discrimination unrelated to [its] distinctively proscribable content." Id. at 383-84, 112 S.Ct. 2538.
¶ 72 Here, the basis for the discrimination consists entirely of the reasons that the calculated falsehood may be proscribed, and therefore no significant danger of viewpoint discrimination exists. As explained, lies about public officials are clearly outweighed by "`the social interest in order and morality,'" Garrison, 379 U.S. at 75, 85 S.Ct. 209 (quoting Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766), because they undermine the integrity and reliability of the election process, distort the political process through untrue and inaccurate speech that misinforms the voters and so interferes with the democratic process and the orderly way that change should be effected, lower the quality of campaign discourse and debate by generating response to the attacks rather than engagement on major issues, lead to public cynicism and apathy toward the electoral process, and cause or increase voter alienation and distrust of the political process. Further, such false speech implicates the societal interest in individual reputations, which concerns both the individual who is attacked and those qualified persons who will be deterred from seeking political office-with the resulting harm to the democratic community. These reasons "have special force" when the statements are made about a candidate for office (not including false statements by a candidate about himself or herself). Moreover, the proscribed statements are, in every respect, within the scope of the category of unprotected speech  the proscribed speech is not a "vehicle[] for content discrimination unrelated to [its] distinctively proscribable content." R.A.V., 505 U.S. at 383-84, 112 S.Ct. 2538 (emphasis added).
¶ 73 The majority also finds unconstitutionality in the procedural aspects of the statute because liability under the statute is determined by an administrative agency rather than a jury. Aside from the majority's general disparaging remarks about nonelected officials and its unwarranted claims of censorship, the thrust of the majority's dissatisfaction is that the Public Disclosure Commission determines in the first instance whether there is a violation and, the majority says, there is no requirement that a reviewing court conduct an independent, de novo review, assessing whether the actual malice standard was satisfied. The majority says, in fact, that "[t]he campaign opponents will not be guaranteed . . . independent, de novo judicial review." Majority at 832.
¶ 74 The majority cites Bose, 466 U.S. at 514, 104 S.Ct. 1949, which sets out the principle of independent judicial review in First Amendment cases, but evidently believes it does not apply, apparently as a result of the majority's rejection of the actual malice standard for campaign speech.
¶ 75 Whether RCW 42.17.530 (or any other statute) expressly provides for independent, de novo judicial review, such review unquestionably applies as a matter of constitutional law. A court is required to "`"make an independent examination of the whole record," so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression.'" Bose, 466 U.S. at 508, 104 S.Ct. 1949 (quoting New York Times, 376 U.S. at 285, 84 S.Ct. 710 (quoting Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963))). The independent review rule is "a rule of federal constitutional law." Bose, 466 *843 U.S. at 510, 104 S.Ct. 1949. The Court explained in Bose that in the First Amendment cases where independent review occurred, the limits of the unprotected category as well as the unprotected character of the speech were determined by judicial evaluation of special facts. Id. at 504-05, 104 S.Ct. 1949. The Court said:
In such cases, the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure the protected expression will not be inhibited. . . . The principle of viewpoint neutrality that underlies the First Amendment itself also imposes a special responsibility on judges whenever it is claimed that a particular communication is unprotected.
Id. at 505, 104 S.Ct. 1949 (citation omitted).
¶ 76 Independent de novo judicial review is not limited to cases in which the actual malice standard is applied. Instead, as the Court observed in Bose, it has applied the principle of independent review in a number of First Amendment contexts, including cases where speech was claimed to be unprotected fighting words, incitement to riot, obscenity, child pornography, and defamation. See id. at 499, 504-08, 104 S.Ct. 1949. Following Bose, the Court also applied independent judicial review to a First Amendment question in a case involving the question of whether Massachusetts could require private citizens organizing a parade to include a group imparting a message that the organizers did not want to communicate, and the Court had to examine validity of state courts' characterization of parades as lacking the element of expression, Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), and a First Amendment question in a case involving a challenge to an ordinance that made it unlawful to oppose, molest, abuse, or interrupt a police officer in the execution of his duty, City of Houston, Texas v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).[4]
¶ 77 Thus, irrespective of whether there is a statutory requirement for independent, de novo judicial review, the Constitution mandates such review. Accordingly, the absence of a statutory provision for independent judicial review does not chill free speech rights as the majority asserts.
¶ 78 Contrary to the majority's conclusion, RCW 42.17.530(1)(a) is constitutional because it does not proscribe protected speech.
¶ 79 The lead opinion in 119 Vote No!, does not compel a different result both because it does not address the particular type of political speech at issue here, aimed at candidates as opposed to ballot measures, and because it was not a majority opinion. Nor does 119 Vote No! contain a majority opinion requiring that all of the elements for a defamation suit must be established in order for speech to fall outside First Amendment protections under New York Times. This is because the concurring opinion by Justice Madsen expressed the view that there "is merit to the contention that the Legislature may constitutionally penalize sponsorship of political advertising" containing "deliberate falsehoods about a candidate for public office" if "a narrower statute" was enacted. 119 Vote No!, 135 Wash.2d at 633, 957 P.2d 691 (Madsen, J., concurring). Such a statute could, the concurrence also suggested, protect the "societal interest in individual reputations." Id. at 635-36, 957 P.2d 691. Lastly, as noted at the outset of this opinion, no majority in 119 Vote No! agreed that government cannot regulate speech in the context of a political campaign based on its truth or falsity under the actual malice standard.

CONCLUSION
¶ 80 I would reverse the Court of Appeals' holding that RCW 42.17.530(1)(a) is facially unconstitutional. The statute accurately sets forth the New York Times standard for determining that certain false statements are not protected speech under the First Amendment, and this standard may constitutionally *844 be applied to regulate candidates' speech during election campaigns.
¶ 81 The majority's rhetoric could lead one to believe that onerous government censorship is at stake. This is far from the case. Instead, the actual malice standard poses no danger to free political speech. First, it is the standard established by the Court to satisfy competing constitutional concerns. Second, whether political speech falls under this standard will not be left to the vagaries of political appointees or governmental agencies. Whether evidence supports a finding of actual malice is a question of law subject to independent de novo judicial review. Third, the actual malice standard is a very difficult standard to satisfy, whether in the context of a civil defamation suit or in another context such as the political campaign speech in question here. But where the standard is applicable, applying it will beneficially serve the voters, the candidates, and the democratic process.
¶ 82 False campaign statements made with knowledge of falsity or reckless disregard of truth or falsity undercut the trustworthiness of the election process, which can be twisted by untrue speech that deceives the voters and so impedes the process by which change should be brought about. False political speech can lower the value of campaign dialogue and discussion by generating reaction to attacks rather than fruitful discussion and debate on the issues. False campaign statements can cause public suspicion of candidates and their campaigns and engender indifference; it can lead to or increase voter alienation and mistrust of the political process. False campaign speech about candidates involves individual reputations, both the reputations of those who are attacked and of those who are qualified for public office but who will be deterred from running, with the result being harm to the democratic community.
¶ 83 I dissent.
WE CONCUR: TOM CHAMBERS, MARY E. FAIRHURST, BOBBE J. BRIDGE, JJ.
NOTES
[1] See Rickert v. Pub. Disclosure Comm'n, 129 Wash.App. 450, 119 P.3d 379 (2005).
[2] At present, 14 states have laws similar to RCW 42.17.530(1)(a). Six of these statutes are virtually identical. See COLO.REV.STAT. ANN. § 1-13-109 (LexisNexis); FLA. STAT. ANN. § 104.271 (West); MINN.STAT. ANN. § 211B.06 (West); MONT.CODE ANN. § 13-37-131 (LexisNexis); OHIO REV.CODE ANN. § 3517.21 (LexisNexis); OR.REV.STAT. ANN. § 260.532. The eight remaining statutes are more stringent than Washington's law in certain respects. Six of these laws require the person to act "knowingly." See MASS. GEN. LAWS ANN. ch. 56, § 42 (West); N.D. CENT.CODE § 16.1-10-04 (LexisNexis); TENN.CODE ANN. § 2-19-142 (Lexis/Nexis); UTAH CODE ANN. § 20A-11-1103 (LexisNexis); W. VA.CODE ANN. § 3-8-11 (LexisNexis); WIS. STAT. ANN. § 12.05 (West), while two require that the false statements also be defamatory or constitute fighting words. See MISS.CODE ANN. § 23-15-875; N.C. GEN.STAT. ANN. § 163-274(8) (Lexis/Nexis).
[3] See, e.g., Pestrak v. Ohio Elections Comm'n, 926 F.2d 573 (6th Cir.1991) (upholding, in part, former OHIO REV.CODE ANN. § 3599.09.1(B)(1)) (renumbered OHIO REV.CODE ANN. § 3517.21 (LexisNexis)).
[4] A finding of fact erroneously denominated as a conclusion of law will be treated as a finding of fact. State v. Luther, 157 Wash.2d 63, 78, 134 P.3d 205 (2006).
[5] The State conceded this point in one brief. Resp't's Ct. of Appeal Br. at 24.
[6] "Spinning" is a common term used to describe putting different perspectives on facts.
[7] The Supreme Court has indicated that false statements about private individuals made with actual malice, but which are not defamatory, may not be protected speech. See Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). However, the Court has not held that false statements about public figures made with actual malice, but which are not defamatory, are devoid of all constitutional protection. All of the Court's assertions that calculated falsehoods about public officials or figures lack constitutional protection have been made in the context of suits involving defamation. See Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Thus, the statements deemed unprotected speech in the above cases were all defamatory, as well as false. Hence, none of the above cases are determinative as to the constitutional protection afforded false but nondefamatory statements like those at issue in this case.
[8] "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT (SECOND) OF TORTS § 559 (1977).
[9] While such a review was conducted in this case, it is not mandated by statute. Thus, under RCW 42.17.530(1)(a), the speaker bears the burden of seeking out, and paying for, vindication in the courts whenever the PDC erroneously finds a violation. Review up to and including this court is expensive, protracted, and burdensome.
[1] In 2005 the statute was amended to add "or an electioneering communication" following the words "[p]olitical advertising" at the beginning of subsection (a). Laws of 2005, ch. 445, § 10, at 1899. This amendment is not at issue in this case.
[2] Some states have enacted laws that allow candidates to voluntarily sign codes of fair campaign practices, which generally include a promise not to use or permit false statements about an opponent in campaign advertising or other campaign communications. E.g., CAL. ELEC.CODE § 20440 (West); HAW.CODE R. § 2-14.1-25 (and ex. A); 10 Ill. Comp. Stat. 5/29B-10; ME.REV.STAT. ANN. title 21-A § 1101; MONT.CODE ANN. § 13-35-301; NEV.REV.STAT. § 294A.290; N.Y. ELEC. § 3-106 (McKinney) and N.Y. COMP.CODES R. & REGS. title 9, § 6201.1.
[3] In fact, the defendants did not attempt to argue that the provisions contained the actual malice standard. Ancheta, 135 F.Supp.2d at 1122.
[4] The requirement of independent, de novo judicial review is discussed extensively in State v. Kilburn, 151 Wash.2d 36, 49-52, 84 P.3d 1215 (2004).