**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| ONEAMERICA VOTES, a Washington Nonprofit; ONEAMERICA, a Washington Nonprofit; LOCAL #4121, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, a labor organization; MUDIT KAKAR, an individual; VIRGINIA FLORES, an individual; and NAYON PARK, an individual, <br><br> Appellants, <br><br> v. <br><br> STATE OF WASHINGTON, a political subdivision; WASHINGTON STATE ATTORNEY GENERAL's OFFICE, an executive department; BOB FERGUSON, in his official capacity as Attorney General; WASHINGTON STATE PUBLIC DISCLOSURE COMMISSION, a state agency; and PETER LAVALLEE, in his official capacity as Executive Director of the PDC, <br><br> Respondents. | No. 83836-9-I <br><br> DIVISION ONE <br><br> PUBLISHED OPINION |

INTRODUCTION

ANDRUS, C.J. — Three non-citizen Washington residents, two advocacy organizations, and a union challenge the constitutionality of the 2020 amendments

No. 83836-9-I/2

to the Washington Fair Campaign Practices Act (FCPA)[1] and a Public Disclosure Commission (PDC) regulation banning foreign nationals from making contributions to political candidates and ballot measures.[2]

The Challengers argue the contribution ban in RCW 42.17A.417(1) and (2)(a) and the prohibition on foreign nationals' participation in organizational decisions to make donations in RCW 42.17A.417(2)(b), violate their free speech and associational rights under article I, § 4 and § 5 of the Washington Constitution. They further contend the law constitutes impermissible discrimination based on alienage in violation of article I, § 12 of the Washington Constitution.

We hold that individuals who are neither United States citizens nor permanent resident aliens do not have a constitutional right to make political contributions in state and local elections, or to participate in any decision-making regarding the financing of political contributions by the organizations with which they affiliate. They do have a right to endorse candidates and ballot measures if the endorsement is unrelated to an organization's decision to finance a specific candidate or ballot measure. Nothing in the FCPA prohibits this speech. To the extent that the law restricts the speech or associational rights of the Organizational Challengers, it does so narrowly to achieve a compelling state interest and survives strict scrutiny. We therefore affirm the summary judgment in favor of the State of Washington.

---

[1] Ch. 42.17A RCW.

[2] We refer to the plaintiff group as the "Challengers," the "Individual Challengers," or the "Organizational Challengers" as appropriate to the context of each group's arguments.

No. 83836-9-I/3

## LEGAL CONTEXT OF CONSTITUTIONAL CHALLENGE

In 1966, the United States Congress sought to limit foreign influence over American elections by passing the Federal Elections Campaign Act,[3] prohibiting agents of foreign governments from contributing to political candidates. *Bluman v. Federal Election Commission*, 800 F. Supp. 2d 281, 283 (D. D.C. 2011) (citing Pub. L. No. 89-486, § 8(a), 80 Stat. 244, 248 (1966)). Congress expanded the ban in 1974 to make it unlawful for any foreign national[4] to contribute to any candidate for elected office. *Bluman*, 800 F. Supp. 2d at 283 (citing Pub. L. No. 93-443 § 101(d), 88 Stat. 1263, 1267 (1974)). In 1998, after a congressional committee found that foreign citizens had used "soft money"[5] contributions to political parties to buy access to American political officials, it passed the Bipartisan Campaign Reform Act of 2002 (BCRA), Pub. L. No. 107-155, § 303, 116 Stat. 81, 96 (2002), expanding the ban to prohibit foreign nationals from expending funds for campaigns or making contributions to political parties. *Bluman*, 800 F. Supp. 2d at 284.

Under the BCRA, it is now unlawful for any foreign national to "directly or indirectly" make a contribution or donation of money "in connection with a federal, state or local election." 52 U.S.C. § 30121(a)(1)(A). It is similarly unlawful for that

---

[3] 2 U.S.C. § 441e, now codified as 52 U.S.C. § 30121.

[4] Congress defined "foreign national" as a government of a foreign country, a foreign political party, a non-citizen residing outside the United States, and any individual living inside the United States who is not a citizen or lawful permanent resident of the United States. 52 U.S.C. § 30121(b)(1), (2); 22 U.S.C. § 611(b).

[5] "Soft money" refers to contributions to political parties, rather than to candidates themselves, which are intended to influence state or local elections. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 123, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003).

- 3 -

No. 83836-9-I/4

foreign national to contribute to any political party, or to spend money on any "electioneering communication."[6]  52 U.S.C. § 30121(a)(1)(B), (C).

The Federal Election Commission (FEC) also promulgated a regulation to prohibit foreign nationals from participating in organizational decisions to spend money in federal, state, or local elections:

> *Participation by foreign nationals in decisions involving election-related activities.*  A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee.

11 C.F.R. § 110.20(i) (emphasis added).

In 2011, several foreign nationals living and working in the United States on temporary work visas challenged the constitutionality of 52 U.S.C. § 30121(a). *Bluman*, 800 F. Supp. 2d at 285.  A three-judge panel[7] of the United States District Court for the District of Columbia upheld the BCRA against a First Amendment challenge.  *Id*. at 281.  It held the government may ban foreign national contributions and expenditures.  *Id.* at 289.  The United States Supreme Court

---

[6] An "electioneering communication" is any broadcast, cable, or satellite communication which refers to a clearly identified candidate for federal office that is made within 30 days of a primary election or political party caucus or convention, or within 60 days of a general election.  52 U.S.C. § 30104(f)(3).

[7] Under 28 U.S.C. § 2284(a), a district court of three judges "shall be convened when otherwise required by Act of Congress."  Section 403(a) of the BCRA mandated that any challenge to the constitutionality of the statute would be decided by a three-judge court in the District of Columbia, convened under 28 U.S.C. § 2284.  *See* Pub. L. 107-155, § 403(a).

- 4 -

No. 83836-9-I/5

summarily affirmed this decision without opinion. *Bluman* v. *Federal Election Commission*, 565 U.S. 1104, 132 S. Ct. 1087, 181 L. Ed. 2d 726 (2012).

In 2019, the United States Department of Justice issued its "Report on the Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report"), which documented the ways in which the Russian government interfered in the 2016 presidential election in "sweeping and systematic fashion." That same year, a federal grand jury indicted an unnamed Russian national who conspired with United States citizens to violate federal election laws.

In response to these events, the Washington legislature enacted SSB 6152, now codified in chapter 42.17A RCW, amending the FCPA to ban foreign national contributions in state and local elections. *See* LAWS OF 2020, Ch. 152, §§ 1-11. The legislature found:

> that the First Amendment rights of freedom of speech and free association, as they relate to participating in elections, are core values in the United States. The United States supreme court has repeatedly held that these rights include the right to make campaign contributions in support of candidates and ballot measures at the federal, state, and local levels.
>
> The legislature also finds, in accordance with federal law, that these rights are reserved solely for citizens of the United States and permanent legal residents, whether they act as individuals or in association. The First Amendment protection for political speech does not apply to foreign nationals, who are forbidden under 52 U.S.C. Sec. 30121 from directly or indirectly making political contributions or financing independent expenditures and electioneering communications, either individually or collectively through a corporation or other association. Furthermore, federal law prohibits any person from knowingly soliciting or receiving contributions from a foreign national. Therefore, it falls to individual states to help protect the prohibition on foreign influence in our state and local elections by requiring certification that contributions, expenditures, political advertising, and electioneering communications are not financed in any part by foreign nationals and

that foreign nationals are not involved in making decisions regarding such election activity in any way.

SSB 6152, § 1 (2020) (emphasis added).

The state law, like federal law, now bans direct contributions by foreign nationals[8] and prohibits anyone from making a contribution if a foreign national participated in the decision to make it:

> (1) A foreign national may not make a contribution to any candidate or political committee, make an expenditure in support of or in opposition to any candidate or ballot measure, or sponsor political advertising or an electioneering communication.
>
> (2) A person may not make a contribution to any candidate or political committee, make an expenditure in support of or in opposition to any candidate or ballot measure, or sponsor political advertising or an electioneering communication, if:
>
> (a) The contribution, expenditure, political advertising, or electioneering communication is financed in any part by a foreign national; or
>
> (b) Foreign nationals are involved in making decisions regarding the contribution, expenditure, political advertising, or electioneering communication in any way.

RCW 42.17A.417. Every candidate and political committee must now certify to the PDC that they have accepted no contributions financed in any part by a foreign national and that foreign nationals were not involved in making decisions regarding the contribution in any way. RCW 42.17A.418(1)(a), (b).

---

[8] The law defines "foreign national" as:

> (a) An individual who is not a citizen of the United States and is not lawfully admitted for permanent residence;
> (b) A government, or subdivision, of a foreign country;
> (c) A foreign political party; and
> (d) Any entity, such as a partnership, association, corporation, organization, or other combination of persons, that is organized under the laws of or has its principal place of business in a foreign country.

RCW 42.17A.005(24).

The PDC subsequently promulgated WAC 390-16-330, a regulation clarifying the law:

> (a) For purposes of RCW 42.17A.417, and throughout chapter 42.17A RCW, a foreign national is "involved in making decisions regarding the contribution, expenditure, political advertising, or electioneering communication in any way" if the foreign national directs, dictates, controls, or directly or indirectly participates in the decision-making process regarding the financing any such contribution, expenditure, advertisement, or communication.
>
> (b) In addition to the criteria under (a) of this subsection, a foreign national is involved in the decision-making regarding a contribution, expenditure, political advertising, or electioneering communication made by an entity that is a subsidiary, branch, unit, or division of a foreign national, or otherwise established, financed, maintained, or controlled by a foreign national, if the foreign national has:
>
>> (i) Made an endorsement or recommendation to support or oppose the same candidate or ballot proposition; or
>>
>> (ii) Directly or indirectly collaborated or consulted with the entity on matters relating to the support of or opposition to the same candidate or ballot proposition.

WAC 390-16-330(2).

FACTUAL BACKGROUND OF CURRENT CHALLENGE

A group of organizational and individual plaintiffs filed this suit claiming that RCW 42.17A.417 and WAC 390-16-330 violate their free speech and association rights under the State Constitution. They additionally contend the law violates the state equal protection clause of article I, § 12.

Plaintiff OneAmerica was founded in the wake of September 11, 2001 to advocate for "immigrant rights, education, economic and environmental justice, voting rights, and immigrant integration." OneAmerica seeks to identify leaders among immigrant and refugee communities to help them develop skills to advocate

- 7 -

No. 83836-9-I/8

for their respective communities. OneAmerica, with a staff of 30, is a family of organizations: OneAmerica, a 501(c)(3) organization, OneAmerica Votes, a 501(c)(4) political organization, OneAmerica Votes Justice Fund, a Washington political action committee, and OAV Justice for All PAC, a federal political action committee.

OneAmerica Votes administers the OneAmerica Votes Justice Fund, which makes contributions to and expenditures on behalf of candidates for state and local elected office. Its funding decisions are based on recommendations from its Board of Directors, one member of which is plaintiff Mudit Kakar, a lawyer and an Indian citizen residing in Seattle and working in the United States under an H-1B visa. Kakar has been the Chair of OneAmerica's Fundraising and Development Committee since 2020, personally donates to One America, and votes as a board member on recommendations to support or endorse ballot measures.

OneAmerica also has a Grassroots Leadership Council, an advisory group of immigrants and refugees who provide guidance to OneAmerica on political strategy. The Council interviews electoral candidates and makes recommendations to the Board of Directors about which candidates to endorse and which ballot initiatives to support or oppose. Plaintiff Virginia Flores, a Mexican citizen and self-described undocumented immigrant who has lived in Washington since at least 2014, serves on the Council and participates in the Council's process of recommending candidate endorsements.

Local #4121 of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (Local 4121) is a labor union,

registered as a 501(c)(5) tax-exempt organization, representing 6,000 academic students and post-doctoral researchers at the University of Washington. Local 4121 is governed by a Joint Council, composed of an Executive Board and Head Stewards. It participates in campaign finance activities through the UAW Western States Political Action Committee (Western States PAC). Local 4121 has a Political Working Group that researches ballot initiatives and electoral campaigns, issues candidate questionnaires, and interviews candidates to determine which are the best advocates for workers, science, and economic justice.

Twenty-five percent of Local 4121 members are international students or scholars here on temporary resident visas. Local 4121 allows non-citizens and non-permanent residents to participate in the Joint Council and its Political Working Group. Plaintiff Nayon Park, a South Korean citizen enrolled in a 5-year Ph.D. chemistry program and in the United States on an F-1 student visa, sits on Local 4121's Joint Council and serves as a Head Steward. Park votes on candidate endorsement recommendations from the Political Working Group, which in turn provides direction to the Western States PAC on which electoral candidates to support and how much money to spend on their campaigns.

On cross motions for summary judgment, the parties agreed that Kakar, Park, and Flores are "foreign nationals" under RCW 42.17A.005(24), and are prohibited from making direct monetary contributions under RCW 42.17A.417(1). They also agreed that OneAmerica and Local 4121 are prohibited under RCW 42.17A.417(2)(a) from making any contributions financed in any way by any of these individuals or any other foreign nationals. Finally, the parties agreed that

RCW 42.17A.417(2)(b) prohibits both OneAmerica and Local 4121 from making any contribution or expenditure if they allow any foreign national, including the three individual challengers here, to participate in the decision-making process regarding the contribution or expenditure.

The parties disputed, however, the scope of the prohibitions contained in RCW 42.17A.417(2)(b) and its accompanying WAC provision. The Challengers contended that the law bars foreign nationals from engaging in internal organizational discussions about candidates or ballot measures or from advising their organizations on matters of political advocacy. The State argued that the law is narrowly drafted to preclude participation by foreign nationals only in financing decisions. The trial court held that RCW 42.17A.417 and WAC 390-16-330 pass constitutional muster. The Challengers appeal.

## ANALYSIS

### A. Standard of Review

We review the constitutionality of a statute de novo. *State v. Watson*, 160 Wn.2d 1, 5, 154 P.3d 909 (2007). We also review a summary judgment order de novo and perform the same inquiry as the trial court. *Borton & Sons, Inc. v. Burbank Props., LLC*, 196 Wn.2d 199, 205, 471 P.3d 871 (2020).

### B. Justiciability

The State argues that the Challengers lack the requisite injury to challenge RCW 42.17A.417 or WAC 390-16-330. We disagree.

No. 83836-9-I/11

The Uniform Declaratory Judgment Act (UDJA)[9] permits any person "whose rights, status or other legal relations" are affected by a state statute to ask a court to determine that statute's validity. RCW 7.24.020. In the absence of issues of major public importance, the UDJA requires a justiciable controversy (1) which is an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive. *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973).

The State contends the Challengers lack standing under the third element of the *Diversified Industries* test. *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 414, 27 P.3d 1149 (2001).[10] "The kernel of the standing doctrine is that one who is not adversely affected by a statute may not question its validity." *Walker v. Munro*, 124 Wn.2d 402, 419, 879 P.2d 920 (1994). To establish standing, the plaintiffs must establish: (1) the interest sought to be protected is within the zone of interests being regulated by the law in question and (2) the challenged action has caused injury in fact to that party. *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004).

---

[9] Ch. 7.24 RCW.

[10] Our Supreme Court has recognized an exception to *Diversified*'s standing test when a party raises an issue of "broad overriding public import." *Walker v. Munro*, 124 Wn.2d 402, 432, 879 P.2d 920 (1994). The Challengers do not argue that this case falls into this exception so we do not consider it here.

- 11 -

No. 83836-9-I/12

The Challengers fall within the zone of interests regulated by RCW 42.17A.417. The law plainly bans political contributions from or financed by foreign nationals and bans foreign nationals from being "involved in making decisions regarding" political contributions. In passing the bill, the legislature found that "the First Amendment rights of freedom of speech and free association, as they relate to participating in elections . . . are reserved solely for citizens of the United States and permanent legal residents, whether they act as individuals or in association." LAWS OF 2020, ch. 152, § 1. Zakar, Park, and Flores are all foreign nationals who have made political contributions in the past or participate in organizations that make political contributions and are actively involved in the decision-making process surrounding those contributions. These individuals are exactly those whose conduct is regulated by RCW 42.17A.417.

The State argues that neither the statute nor the WAC prohibits anyone from endorsing a candidate or ballot measure because the endorsement restriction of WAC 390-16-330(2)(b)(i) applies only to foreign-controlled organizations. But the statute does prohibit organizations, including OneAmerica and Local 4121, from making any contribution if a foreign national is "involved" in the decision to make that contribution. RCW 42.17A.417(2)(b). Under the WAC, "involvement" includes "directly or indirectly participating" in a financing decision. WAC 390-16-330(2)(a). If an organization's decision to endorse a candidate or ballot measure occurs in conjunction with its decision to endorse, and foreign nationals participate in those internal discussions, the Challengers contend this activity would be prohibited under the "indirect participation" prong of subsection (2)(a), regardless of whether

- 12 -

No. 83836-9-I/13

the endorsement provision of subsection (2)(b) applies. The Challengers clearly raise a justiciable issue regarding the scope of the prohibition as laid out in WAC 390-16-330(2)(a).

We reach the same conclusion regarding the Organizational Challengers. The State argues that the Organizational Challengers are domestic entities and do not fall under the separate rules for foreign-controlled entities. But RCW 42.17A.417(2)'s contribution restriction extends to any "person." RCW 42.17A.005(39) defines "person" as "an individual, partnership, joint venture, public or private corporation, association, federal, state or local governmental entity or agency however constituted, candidate, committee, political committee, political party, executive committee thereof, or any other organization or group of persons, however organized." This part of the statute is not limited to foreign-controlled entities. They submitted declarations explaining how the organizations must change their operating procedures if foreign nationals cannot participate in funding decisions. This evidence satisfies the actual injury prong of the standing test. The Organizational Challengers have standing, even if they are not foreign-controlled entities.

C. RCW 42.17A.417(1) and (2)(a)'s Ban on Campaign Contributions by Foreign Nationals

The Challengers contend RCW 42.17A.417(1) and (2)(a) violate article I, § 5 of the Washington Constitution because spending money on political activities is "classically protected free speech and association," which the State cannot curtail. They argue that *Bluman*, which upheld an identical contribution ban under the First Amendment, does not control because our state constitution offers broader free

- 13 -

speech protections than does the First Amendment. They maintain that RCW 42.17A.417(1) and (2)(a) constitute a prior restraint on protected speech, categorically forbidden by the state constitution, therefore rendering a *Gunwall*[11] analysis unnecessary. Finally, the Challengers contend that under *Gunwall*, we should hold that foreign nationals have the state constitutional right to make financial contributions to candidates and ballot measures. We reject these arguments.

1. Prior Restraint

The Challengers first argue that the contribution ban is an impermissible prior restraint under our State Constitution. They advance this claim because our Supreme Court has recognized that article I, § 5 is less tolerant than the First Amendment of overly broad restrictions on speech when the restrictions rise to the level of a prior restraint. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 117, 937 P.2d 154 (1997).

But RCW 42.17A.417's foreign national contribution ban is a "prior restraint" only if it prohibits protected speech. A prior restraint is an administrative action or court order forbidding protected communications prior to their occurrence. *Voters Educ. Comm. v. Wash. State Pub. Disclosure Comm'n*, 161 Wn.2d 470, 494, 166 P.3d 1174 (2007); *State v. J-R Distrib., Inc.*, 111 Wn.2d 764, 776, 765 P.2d 281 (1988). A law is not an impermissible prior restraint if the expression falls into one of the narrowly defined exceptions to protected speech. *Id.* at 777 (prior restraint on distribution of obscene materials is constitutional).

---

[11] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)*.*

The Challengers argue that their right to make financial contributions is protected speech under *Washington State Republican Party v. Washington State Public Disclosure* Commission, 141 Wn.2d 245, 4 P.3d 808 (2000). But that case did not arise in the context of foreign national campaign contributions or expenditures. In that case, our Supreme Court considered a PDC determination that the Republican Party violated state election laws by using soft money to purchase a television advertisement critical of then gubernatorial candidate Gary Locke. *Id.* at 250. It held that former RCW 42.17.640's dollar limitations on issue-oriented advertisements by political parties—speech protected by the First Amendment—was unconstitutional. *Id.* It did not address or even discuss campaign contribution limits imposed on foreign nationals. In a case where a legal theory is not discussed in an opinion, we do not consider that case to be controlling on a future case where the legal theory is properly raised. *Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 824-25, 881 P.2d 986 (1994).

There is no Washington precedent supporting the Challengers' contention that a ban on campaign contributions by foreign nationals constitutes a prior restraint on free speech in violation of article I, § 5. Under this scenario, we cannot accept the Challengers' argument that a *Gunwall* analysis is unnecessary. Although our Supreme Court has recognized that article I, § 5 extends broader protections than does the First Amendment in certain contexts, *see O'Day v. King County*, 109 Wn.2d 796, 804-05, 749 P.2d 142 (1988) and *State v.* Reece, 110 Wn.2d 766, 778, 757 P.2d 947 (1988), it has also indicated that article I, § 5 is not

always more protective. The inquiry must focus on "the specific context in which the state constitutional challenge is raised."[12] *Ino Ino*, 132 Wn.2d at 115. We thus cannot say categorically that article I, § 5 always provides greater protection than the First Amendment. Because no Washington court has addressed a law prohibiting foreign nationals from making campaign contributions under article I, § 5, we must consider whether the State Constitution is more protective than the First Amendment in this specific context under *Gunwall*.

2. *Gunwall* Factors Applied to Foreign National Campaign Contributions

The Challengers argue that the *Gunwall* factors support a conclusion that foreign nationals have an article I, § 5 right to make campaign contributions in this state. We disagree.

Under *Gunwall,* we consider the six nonexclusive neutral criteria to determine whether, in this particular context, the Washington state constitution should be considered as extending broader rights than the federal constitution: "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." 106 Wn.2d at 58. Analyzing these factors, we conclude that article I, § 5 does not guarantee to foreign nationals the right to make political campaign contributions in state or local elections, either for candidates or ballot measures.

---

[12] For example, laws criminalizing the possession of obscenity, prohibiting telephone harassment, and imposing liability for making false or defamatory statements receive no greater protections under article I, § 5 then they do under that provision's federal counterpart. *Ino Ino*, 132 Wn.2d at 115-16.

No. 83836-9-I/17

The first two *Gunwall* factors focus our attention on the text of the two constitutions. 106 Wn.2d at 61. Article I, § 5 provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The First Amendment is textually different: "Congress shall make no law . . . abridging the freedom of speech."

The Challengers argue that the reference in article I, § 5 to "every person," indicates the intent to extend full free speech protections, including the right to make campaign contributions, to foreign nationals. But foreign nationals enjoy many of the same First Amendment rights as U.S. citizens do. *See Bluman*, 800 F. Supp. 2d at 286-87. The right to free speech extends to all "persons," including aliens residing in the United States. *Bridges v. Wixon*, 326 U.S. 135, 148, 65 S. Ct. 1443, 89 L. Ed. 2103 (1945) (resident aliens protected by First Amendment in context of deportation); *See also Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995) (First Amendment acknowledges no distinction between citizens and resident aliens). The identity of the individuals enjoying the protections of article I, § 5 is thus not substantively different than those who benefit from the First Amendment.

That foreign nationals enjoy the right "to speak, write and publish" does not mean they also have the right to participate in elections as an exercise of speech. Under *Gunwall*, the text of other relevant statutory provisions of the state constitution provides guidance. 106 Wn.2d at 61. Here, there are several other constitutional provisions reserving this right to citizens. The right to vote, for example, is limited to "citizens of the United States." WASH. CONST., art. VI, § 1.

- 17 -

No. 83836-9-I/18

The right to sign an initiative petition is restricted to "legal voters." WASH. CONST., art. II, § 1(a). And only "registered voters" may sign referendum petitions. WASH. CONST., art. II, § 1(b). These provisions support the proposition that the right to free speech guaranteed by article I, § 5 does not extend to the right of foreign nationals to participate in all aspects of Washington electoral politics.

The third *Gunwall* factor looks to our history of the adoption of a particular state constitutional provision to determine if it reflects an intention to confer greater protection from the state government than the federal constitution affords from the federal government. 106 Wn.2d at 61.

The Washington Constitution was adopted at a constitutional convention that convened in July and August 1889. Arthur S. Beardsley, *Sources of Washington Constitution: Comparative Study of Articles*, *in* CONSTITUTIONS OF THE UNITED STATES AND OF THE STATE OF WASHINGTON (1955) (hereafter "Beardsley"); THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 1, 449 (Beverly Paulik Rosenow, editor 1999) (hereafter "Journal"). According to Beardsley,

> The Constitution of Washington was the result of a study of the constitutions of many states. The constitutions of Oregon and California influenced it the most; but a considerable number of its sections show similar and identical language taken from the constitutions of Wisconsin, Missouri, Colorado, and Indiana. A lesser number of sections show the influence of the constitutions of Illinois, Pennsylvania, Texas, and Ohio. Altogether provisions from twenty-three state constitutions were copied into the final draft.

No. 83836-9-I/19

Beardsley at 166. Article I, § 5 was almost identical in text to the California Constitution of 1879[13] and similar to that found in the Oregon Constitution of 1857.[14] W. Lair Hill, who supplied the Washington delegates with an initial draft model constitution, replicated these provisions.[15] Beardsley at 168; Wilfred J. Airey, *A History of the Constitution and the Government of Washington Territory* 455 (University of Washington Ph.D. thesis, 1945).

The Journal contains no indication that the standing committee tasked with recommending a final version of a Bill of Rights, or the delegate who approved the committee's recommendation, spent any time debating the text of article I, § 5. The committee's July 25, 1889 report proposed the language we see today in our free speech provision.[16] Journal, at 153-54. The delegates adopted it without change on August 6, 1889. Journal, at 268-69. This history does not reveal a basis for concluding that the framers sought—with the language they chose to

---

[13] Article I, § 9 of the California Constitution of 1879 provided: "Every citizen may freely speak, write, and publish his sentiments, on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." https://archives.cdn.sos.ca.gov/collections/1879/archive/1879-constitution.pdf.

[14] Article I, § 8 of the Oregon Constitution of 1857 provided: "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." https://sos.oregon.gov/blue-book/Documents/state-1857-constitution1.pdf.

[15] Just before the delegates convened, W. Lair Hill, an attorney in Oregon and California, with experience as a code writer of Oregon and the former editor of the Portland Oregonian, and a new resident of Seattle, prepared, at the request of the Oregonian, a draft model state constitution. Beardsley, at 165. The Hill draft was used by the convention delegates as the working basis on which to build the new constitution. *Id.*

[16] On July 11, 1889, delegate Allen Weir proposed alternative language for this article: "The right of free speech written, printed, or spoken, when not infringing the rights of others, shall forever remain inviolate, and shall be secured to every citizen." Journal, at 14, 50-51. There is no record of any debate occurring regarding the different proposed versions of this article.

- 19 -

No. 83836-9-I/20

include in article I, § 5—to grant broader speech rights to foreign nationals than those contained in the First Amendment.

The Challengers argue the history of the State Constitution's adoption operates in their favor because the framers granted certain aliens the right to vote before they became citizens. They contend that the framers must not have intended to tie citizenship to the right to participate in elections. But the Challengers overstate the political rights extended to aliens at the ratification of the Washington Constitution. The original text of article VI, entitled "Elections and Elective Rights," provided:

> All male persons of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all elections: They shall be citizens of the United States; they shall have lived in the state one year, and in the county ninety days, and in the city, town, ward or precinct thirty days immediately preceding the election at which they offer to vote. . . . Provided, further, that <u>all male persons who at the time of the adoption of this Constitution are qualified electors of the Territory, shall be electors</u>.

WASH. CONST. art. VI, § 1 (1889) (emphasis added). The "territorial qualified electors" exception in the original version of article VI tracks the state's Organic Act, in which Congress conferred the right to vote on United States citizens and those non-citizens who had declared an intention to become citizens:

> That <u>every white male inhabitant</u> above the age of twenty-one years, who shall have been a resident of said Territory at the time of the passage of this act, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election . . . . Provided, That <u>the right of suffrage and of holding office shall be exercised only by citizens of the United States</u> above the age of twenty-one years, <u>and those above that age who shall have declared on oath their intention to become such</u>, and shall have taken an oath to support the Constitution of the United States and the provisions of this act.

- 20 -

No. 83836-9-I/21

Organic Act, ch. 90, § 5, 10 Stat. 172 (1853) (emphasis added). Thus, the only individuals who could vote in territorial elections were white males who were either United States citizens or who had declared under oath, prior to statehood, that they intended to become a United States citizen. Foreign nationals were not allowed to vote in either territorial elections before statehood, or in Washington elections after statehood, unless they had declared their intent to become citizens before the constitution was ratified.[17] In 1974, article VI, § 1 was amended again to eliminate the territorial qualified elector language and now explicitly limits the right to vote to United States citizens. CONST. art. VI, § 1 (1974). Constitutional history thus also does not operate in favor of an independent state analysis.[18]

Under the fourth *Gunwall* factor, pre-existing state law, including statutory law, "may also bear on the granting of distinctive state constitutional rights." 106 Wn.2d at 61. *Gunwall* recognized that state law may have been more responsive

---

[17] In 1896, the state constitution was amended to limit the right to franchise to United States citizens and grandfathered in only those persons previously qualified as territorial electors. Wash. Const. Art. VI, § 1 (1896) (Amendment 2, 1895 Session Laws Ch. 37, p. 60, approved November 1896). See Robert Utter & Hugh Spitzer, THE WASHINGTON STATE CONSTITUTION 132 (2d ed. 2013) (1896 amendment to article VI, § 1 did not affect any previously enfranchised electors).

[18] We cannot leave unstated our racist history as exemplified by the original version of Article II, § 33, which banned land ownership by aliens, "other than those who in good faith have declared their intention to become citizens of the United States," a provision that remained in effect until repealed in 1965. *See* Amendment 42, Senate Joint Resolution No. 20, p. 2816 (November 8, 1966). This provision was apparently taken in part from the Oregon constitution. Airey at p. 458. It reflected a territorial law, passed in 1886, making it illegal for aliens incapable of becoming citizens or alien corporations to hold property in the Washington Territory. Airey at p. 156, n. 2; Mark Lazarus, *An Historical Analysis of Alien Land Law: Washington Territory & State 1853-1889*, 12 U. PUGET SOUND L. REV. 197, 220 (1988) (citing Act of Jan. 29, 1886, 1885-86 Wash. Laws 102, *repealed by* Act of Feb. 3, 1927, ch. 56, § 1, 1927 Wash. Laws 45). Given the rampant racism that led to these alien land laws, it is hard to imagine the framers intended to give foreign nationals the right to participate in electoral politics when it prohibited them from owning real property. *See* Journal at 519, 549-50.

to concerns of its citizens "long before they are addressed by analogous constitutional claims." *Id.* As a result, "[p]reexisting law can thus help to define the scope of a constitutional right later established." *Id.* at 62.

The Challengers argue that preexisting state law operates in their favor because, until 2020, no state law regulated the rights of foreign nationals with regard to political contributions. But the legislature's silence on the issue prior to 2020 does not weigh heavily in either direction because federal law has banned such contributions since 1974. The lack of state laws addressing the rights of foreign nationals to participate in elections does not evidence any intent to protect, or to deny, those rights within the state. The Challengers have cited no case or statute—be it contemporary with the ratification of the Washington constitution or more recent—addressing a foreign national's right to participate in elector politics within the state.

Under the fifth and sixth *Gunwall* factors, we examine whether the structure of the two constitutions differs and whether the issue is a matter of particular state interest or local concern. 106 Wn.2d at 62. The fifth *Gunwall* factor recognizes that the federal constitution is structurally different from the state constitution. While the federal constitution is a grant of enumerated powers to the federal government, the state constitution limits the sovereign power of the state. *Id*. This factor always favors an independent analysis of a state constitutional provision. *State v. Smith*, 150 Wn.2d 135, 152, 75 P.3d 934 (2003). But it otherwise provides little analytical guidance.

No. 83836-9-I/23

The final factor, like the first four, does not weigh in favor of an independent reading of article I, § 5 in the context of foreign political contributions. While we agree that laws governing campaign contributions for state and local political candidates and ballot measures are a matter of state and local concern, similar laws are also of a national concern. The Challengers argue that the legislature's interest in banning foreign national contributions is purely local, affecting only the rights of Washington residents. But the text of the law belies this argument. The legislature, in enacting SSB 6152, specifically invoked 52 U.S.C. § 30121, indicating that "it falls to individual states to help protect the prohibition on foreign influence in our state and local elections by requiring certification that contributions, expenditures, political advertising, and electioneering communications are not financed in any part by foreign nationals." LAWS OF 2020, ch. 152, sec. 1. Thus, the legislature contemplated that state law works in conjunction with federal law to ban the involvement of foreign nationals in domestic elections.

Moreover, the fact that there is a federal statute prohibiting foreign national political contributions in state and local elections also indicates that this matter is a national concern. In *Foley v. Connelie*, 435 U.S. 291, 295-96, 98 S. Ct. 1067, 55 L. Ed. 2d 287 (1978), the Supreme Court recognized the "State's historical power to exclude aliens from participation in its democratic political institutions," as a part of the sovereign's obligation to "preserve the basic conception of a political community." (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647-48, 93 S. Ct. 2842, 37 L. Ed. 2d 853 (1973)). The *Bluman* court, citing both *Foley* and *Sugarman*, stated "[i]t is fundamental to the definition of our national political community that

- 23 -

foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."  800 F. Supp. 2d at 288. Excluding foreign nationals from campaign finance activities is not a matter of particular state or local concern.

We conclude that the article I, § 5 right to free speech is co-extensive with the right guaranteed by the First Amendment in the context of the right of foreign nationals to make or participate in making contributions to state and local candidates or ballot measures.[19]  We therefore follow First Amendment precedent in addressing the specific arguments raised by the Challengers.

3.  Foreign National Contributions under *Bluman*

Under existing First Amendment jurisprudence, foreign nationals have no constitutional right to participate financially in federal, state or local elections.  In *Bluman*, a district court held that Congress may restrict the right of foreign nationals to make campaign contributions because they have no constitutional right to engage in this type of political speech: "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."  800 F. Supp. 2d at 288.

The Challengers argue that *Bluman* is of questionable vitality given the United States Supreme Court's subsequent decision in *McCutcheon v. Federal Election Commission*, 572 U.S. 185, 203, 134 S. Ct. 1434, 188 L. Ed. 2d 468 (2014).  In *McCutcheon*, the Supreme Court addressed a challenge from a

_____

[19] The Challengers do not argue that article I, § 4 also provides more protection than does the federal constitution so we need not address that issue here.

prospective donor and the Republican National Committee to federal aggregate limits on contributions to candidates and noncandidate political committees. 572 U.S. at 194-95. In invalidating the limits, the court recognized that campaign contributions are protected speech because a contribution " 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.' " *Id.* at 203 (quoting *Buckley v. Valeo*, 424 U.S. 1, 21-22, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)). Making campaign contributions, it stated, is participation "in an electoral debate that we have recognized is 'integral to the operation of the system of government established by our Constitution.' " *Id.* at 204 (quoting *Buckley*, 424 U.S. at 14).

But nothing in *McCutcheon* calls into question restrictions on foreign national political spending. Its holding—that state aggregate limits on political donations by *eligible* donors are impermissible unless targeted to prevent quid pro quo corruption—did not reach this issue at all. 572 U.S. at 191. Thus, *McCutcheon* is not precedential in the context of this case. *See Ret. Plans Comm. of IBM v. Jander*, __ U.S. __, 140 S. Ct. 592, 597, 205 L. Ed. 2d 432 (2020) (Gorsuch, J., concurring) ("questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511, 45 S. Ct. 148, 69 L. Ed. 411 (1925)).

Moreover, the Supreme Court affirmed the decision in *Bluman*, making it binding precedent, with or without an opinion accompanying that decision, until the Supreme Court tells us otherwise. *See Hicks v. Miranda*, 422 U.S. 332, 344, 95

- 25 -

S. Ct. 2281, 45 L. Ed. 2d 223 (1975) (votes to affirm summarily are votes on the merits of a case and lower courts are bound by summary decisions of the Court until such time as the Court informs them that they are not). In *United States v. Singh*, 979 F.3d 697, 711 (9th Cir. 2020), the Ninth Circuit held that the Supreme Court's summary affirmance of *Bluman* was binding precedent on the issue of whether a foreign national has a constitutional right to donate money to state senate candidates.

Additionally, the Supreme Court has cautioned courts that its "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued vitality." *Hohn v. United* States, 524 U.S. 236, 252-53, 118 S. Ct. 1969, 141 L. Ed. 2d 242 (1998). The Supreme Court does not overrule prior opinions sub silentio. *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000). There is thus no basis for concluding that *McCutcheon* overruled *Bluman*.

The Challengers argue that *McCutcheon* rejected the notion that the government has a compelling interest in limiting foreign citizen participation in activities of American democratic self-government. They cite to *Thompson v. Hebdon*, 7 F.4th 811, 826 (9th Cir. 2021) as a recent case in which a court rejected "democracy-based arguments for restricting political expenditures by non-residents" based on *McCutcheon*. But *Thompson*, like *McCutcheon,* did not address campaign contributions by foreign nationals. In that case, the Ninth Circuit held that Alaska's dollar limits on campaign contributions were unsupported by the

state's interest in protecting its system of self-governance. *Id.* at 826. It rejected Alaska's reliance on *Bluman* to justify campaign dollar limits on *eligible* donors, but reaffirmed the interest in restricting donations from foreign nationals:

> The plaintiffs in *Bluman* were foreign citizens who sought the right to participate in the United States campaign process by, among other things, making financial contributions to candidates. They argued they should be treated the same as American citizens who, though unable to vote, are permitted to make campaign contributions. The court rejected that argument and based its holding on the conclusion that the plaintiffs, in contrast to American citizens who are unable to vote, were, by definition, outside the "American political community." Thus, contrary to the dissent's statement that *Bluman* cannot "be distinguished on the grounds that it involved a distinction between United States citizens and foreign nationals," … that distinction was the very basis for the *Bluman* court's holding.

7 F.4th at 827, n.7 (internal citations omitted). The jurisprudential foundation of *Bluman*—that foreigners have no constitutional right to fund electoral campaigns in the United States—remains undisturbed by either *McCutcheon* or *Thompson.*

4. Strict Scrutiny of Ban on Foreign National Campaign Contributions

Although we conclude that foreign nationals do not have a free speech right to make political campaign contributions, we nevertheless also conclude that RCW 42.17A.417(1) and (2)(a) survive strict scrutiny.

We generally presume a statute to be constitutional, but the State "bears the burden of justifying a restriction on speech." *Ino Ino* at 114. Any statute that purports to regulate political speech based on its content is subject to strict scrutiny. *Rickert v. Public Disclosure Comm'n*, 161 Wn.2d 843, 848, 168 P.3d 826 (2007). Under this standard, the State must demonstrate that the law "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that

- 27 -

No. 83836-9-I/28

end." *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191, 198, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992)).

The *Bluman* court upheld 52 U.S.C. § 30121 under strict scrutiny. 800 F. Supp. 2d at 285. It recognized that "[t]he government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.' " *Id.* at 287 (quoting *Bernal v. Fainter*, 467 U.S. 216, 220, 104 S. Ct. 2312, 81 L. Ed. 2d 175 (1984)). It follows, the court said, that the government "has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government." *Id.* at 288.

*Bluman* governs our analysis of RCW 42.17A.417(1) and (2)(a). The State's interest in prohibiting foreign nationals from making political contributions and the corresponding interest in prohibiting citizens or domestic organizations from using money from foreign nationals to make such contributions is a compelling one. Both prohibitions advance the same goal: to exclude those who are not citizens from participating in the State's political processes.

The Challengers contend that *Bluman* is at odds with our Supreme Court's decision in *Nielsen v. Washington State Bar Association*, 90 Wn.2d 818, 585 P.2d 1191 (1978), in which the Supreme Court invalidated Washington's Admission to Practice Rule (APR) 2(B)(2), requiring applicants for admission to the bar be U.S. citizens or in the process of becoming a citizen. *Id*. at 820. We disagree.

In *Nielson,* our Supreme Court acknowledged that under *Foley*, 435 U.S. 291, a government may pass laws requiring citizenship for jurors, voters, and law enforcement officers because these roles involve a direct participation in the

- 28 -

No. 83836-9-I/29

execution of public policy. *Nielsen*, 90 Wn.2d at 825. But it held that requiring citizenship as a condition to practice law was inappropriate. It reasoned:

> an attorney does not, by virtue of his oath, have the right to exercise the broad power over people generally, which the Court in *Foley* found significant. He has no power to arrest citizens as does a police officer. He has no power to judge citizens as do judicial officers or jurors. Rather, he "is engaged in a private profession, important though it be to our system of justice. In general[,] he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business."

*Id.* at 824-25 (quoting *Cammer v. United States*, 350 U.S. 399, 405, 76 S. Ct. 456, 100 L. Ed. 474 (1956)). "The responsibilities of one who earns a livelihood as a lawyer do not involve unique matters which lie at the heart of our political institutions and justify a citizenship requirement." *Id.* at 823.

*Nielsen* is consistent with years of Supreme Court precedent drawing a distinction between citizenship requirements to engage in non-governmental professions and those same requirements imposed on individuals serving a political function. In *Cabell v. Chavez-Salido*, 454 U.S. 432, 102 S. Ct. 735, 70 L. Ed. 2d 677 (1982), it held that strict scrutiny is not applicable to citizenship requirements when the interests at issue are political, rather than economic.

> "[O]ur scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives [and] constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders . . . ." And in those areas the State's exclusion of aliens need not "clear the high hurdle of 'strict scrutiny,' because [that] would 'obliterate all the distinctions between citizens and aliens, and thus depreciate the historic value of citizenship.
>
> The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition.

- 29 -

> Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community.

*Id.* at 438-40 (citations omitted).  Under this "political function" doctrine, "laws that exclude aliens from positions intimately related to the process of democratic self-government" are constitutionally permissible.  *Bernal*, 467 U.S. at 220.

*Nielsen* merely recognized the economic-political distinction of *Cabell*.  Its reasoning does not apply to *Bluman* or here, where the challenged law restricts the political, and not economic, activities of aliens.  The issue is not how foreign nationals choose to earn a living, but whether they can be included in activities that are inherently public and at the heart of the American political process.  *Nielsen* does not cast doubt upon the State's ability to limit the participation of foreign citizens in activities of American democratic self-government.  RCW 42.17A.417(1) and (2)(a) are constitutional.

D. <u>RCW 42.17A.417(2)(b)'s Ban on Foreign National Participation in Financial Decision-Making</u>

The Organizational Challengers next contend that RCW 42.17A.417(2)(b) and WAC 390-16-330(2) violate their free speech and associational rights guaranteed by article I, § 4 and article I, § 5.

RCW 42.17A.417(2)(b) prohibits any person from contributing to a candidate or political committee when "foreign nationals are involved in making decisions regarding the contribution, expenditure, political advertising, or electioneering communication in any way."[20]  WAC 390-16-330(2) provides:

---

[20] The FEC regulation, 11 C.F.R. § 110.20(i), contains essentially the same language as RCW 42.17A.417(2)(b), and prohibits contributions from organizations if foreign nationals

(a) For purposes of RCW 42.17A.417, and throughout chapter 42.17A RCW, a foreign national is "involved in making decisions regarding the contribution, expenditure, political advertising, or electioneering communication in any way" if the foreign national directs, dictates, controls, or <u>directly or indirectly participates in the decision-making process</u> regarding the financing any such contribution, expenditure, advertisement, or communication.

(b) In addition to the criteria under (a) of this subsection, a foreign national is involved in the decision-making regarding a contribution, expenditure, political advertising, or electioneering communication made by an entity that is a subsidiary, branch, unit, or division of a foreign national, or otherwise established, financed, maintained, or controlled by a foreign national, if the foreign national has:

(i) <u>Made an endorsement or recommendation to support or oppose the same candidate or ballot proposition</u>; or

(ii) Directly or <u>indirectly collaborated or consulted with the entity on matters relating to the support of or opposition to the same candidate or ballot proposition</u>.

(Emphasis added). The Challengers contend these provisions effectively dictate how the organizations structure their internal deliberations, regulate who may participate in such deliberations, prevent the Individual Challengers from fulfilling their organizational duties to advise and vote on matters of political advocacy, and deprive the organizations of the input of officers and members with the greatest insight into the needs of the immigrant and international student communities.

1. Endorsements, Recommendations, Collaboration, and Consultation under WAC 390-16-330(2)(b)

To the extent the Challengers argue that the language of WAC 390-16-330(2)(b)(i) and (ii) make it impossible for any foreign national to endorse a

---

"directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions." *See* 67 Fed. Reg. 69950 (November 19, 2002).

candidate or ballot measure, or to speak at organizational meetings in favor of or against any candidate or ballot measure, we disagree with their reading of this regulation.

By its very text, WAC 390-16-330(2)(b)'s endorsement prohibition applies only when contributions are made by an entity that "is a subsidiary, branch, unit, or division of a foreign national, or otherwise established, financed, maintained, or controlled by a foreign national." Neither OneAmerica nor Local 4121 falls into the category of foreign-controlled organization covered by the regulation. We reject any constitutional challenge to the regulation on that basis.

2. Direct and Indirect Participation in Financing Decisions under RCW 42.17A.417(2)(b) and WAC 390-16-330(2)(a)

The Challengers also contend the decision-making ban is constitutionally impermissible because it prohibits foreign nationals and their organizations from endorsing a candidate or ballot measure, or debating internally the organization's desire to make an endorsement, under the "indirect participation" prong of the WAC. We disagree with this broad interpretation of the statute and corresponding regulation.

The statute and regulation, as written, prohibit foreign nationals only from internally debating or voting on organizational donations to support or oppose specific candidates or specific ballot measures. This is consistent with *Bluman* in which the federal court held that foreign nationals do not have a constitutional right to engage in such "express advocacy" activities. The Supreme Court, in analyzing various restrictions under the federal BCRA, has drawn a distinction between permissible laws restricting express advocacy for or against a specific candidate,

- 32 -

*see McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 206, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), *overruled in part by Citizens United v. Fed. Elections Comm'n*, 558 U.S. 310, 366, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), and impermissible laws restricting more general issue advocacy. *See Fed. Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449, 481, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007).

In *Bluman*, the federal district court emphasized this distinction and interpreted the BRCA narrowly to preclude only express advocacy relating to a specific candidate. 800 F. Supp. 2d at 284-85. RCW 42.17A.417(2) similarly extends only to express advocacy activities. The statute prohibits an organization from making contributions to a "candidate or political committee" if a foreign national is involved in the decision to do so, but nothing in RCW 42.17.A.417(2) prohibits foreign nationals from engaging in issue advocacy, either within an organization or publicly on behalf of that organization.[21]

"Indirect participation" in a financing decision, as that phrase is used in WAC 390-16-330(2)(a), does not prohibit foreign nationals from debating or voting to make donations to support or oppose public policy issues unrelated to a specific candidate or ballot measure campaign. Foreign nationals may participate, both through discussion and monetary contributions, in decisions to advance their affiliated organizations' goals, when the discussion and contribution arises in the context of issue advocacy. We read the statute narrowly, as the court did in

---

[21] Because *Bluman* narrowly interpreted the BCRA as banning only express advocacy, it cannot be read to support a ban on issue advocacy by foreign nationals. J. Goldenziel, M. Cheema, *The New Fighting Words?: How U.S. Law Hampers the Fight Against Information Warfare*, 22 U. PENN. J. CONST'L L. 81, 131 (2019).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Bluman,* to prohibit only foreign national participation in decisions to provide financial support for or against a specific candidate or a specific ballot measure.

Nor does the statute prohibit foreign nationals from endorsing a candidate or a ballot measure when that endorsement does not occur in the context of a decision to fund a particular candidate's or ballot measure's campaign. Foreign nationals are entitled to discuss, debate, and endorse any candidate or ballot measure they choose as long as their endorsement is not tied to, or made in conjunction with, their organization's decision to fund that candidate or ballot measure. This narrow reading of the statute is important because it helps us decide if it passes constitutional muster.

First, under *Bluman*, participation in express advocacy activities by foreign nationals is not protected speech. If foreign nationals do not have a constitutional right to make political contributions themselves, then they also have no constitutional right to decide how to use the funds of others to influence domestic elections.

Second, the ban on indirect participation in decision-making also passes strict scrutiny. As previously noted, the State has a compelling interest in "limiting the participation of foreign citizens in activities of American democratic self-government." *Bluman*, 800 F. Supp. 2d at 288. The FCPA advances this interest by prohibiting foreign nationals from influencing state and local elections with their own or their organizations' political donations.

We also conclude the State has demonstrated that the statute is narrowly drawn to achieve its compelling interest because it focuses on express advocacy

and does not prohibit political speech other than the financing of specific candidates or ballot measures.

The Challengers rely on *Pilloud v. King County Republican Central Committee*, 189 Wn.2d 599, 404 P.3d 500 (2017), to argue the statute is not narrowly tailored. In *Pilloud*, our Supreme Court invalidated RCW 29A.80.061's requirement that political party precinct committees elect, rather than appoint, district chairs for each legislative district. The court held that the statute infringed the party's freedom of association under the First Amendment by regulating the political party's internal structure. *Id.* at 603. The court recognized that the State has a compelling interest in preserving the integrity of its election process and could interfere with a political party's internal affairs when necessary to ensure that elections are fair and honest. *Id.* at 604. The court rejected the argument that the statute was necessary to prevent county committees from exceeding campaign contribution limits because there was no evidence to support it and other campaign finance laws already prohibited county political committees from exceeding those limits. *Id.* Because the infringement on the party's internal affairs was not proven necessary to ensure fair and orderly elections, it deemed the statute unconstitutional. *Id.*

The Challengers argue that as in *Pilloud*, the State has failed to demonstrate that dictating who, within any organization, can decide how to spend money in an election is necessary to protect the integrity of our elections. But this case is distinguishable from *Pilloud*. Nothing in RCW 42.17A.417(2)(b) dictates to the Organizational Challengers how they select their members, officers, advisors,

or board members. They are free to invite foreign nationals into their membership and to appoint or elect them to positions on their boards or advisory councils. The only restriction is that once there, the foreign nationals cannot participate in decisions to finance a specific candidate or ballot measure campaign.

Moreover, unlike the tenuous connection between the internal process for selecting party district chairs and the integrity of state elections, the relationship between RCW 42.17A.417(2)(b) and the State's compelling interest in preserving the political community is clear and direct:

> Political contributions and express-advocacy expenditures are an integral aspect of the process by which Americans elect officials to federal, state, and local government offices. Political contributions and express-advocacy expenditures finance advertisements, get-out-the-vote drives, rallies, candidate speeches, and the myriad other activities by which candidates appeal to potential voters. We think it evident that those campaign activities are part of the overall process of democratic self-government.

*Bluman*, 800 F. Supp. 2d at 288. By prohibiting foreign nationals from deciding which political campaigns should receive organizational contributions, RCW 42.17A.417(2)(b) directly advances its goal of excluding them from the democratic political process.

The Challengers also do not address the more specific compelling interest advanced by RCW 42.17A.417(2)(b): the need to ensure there are no loopholes in the direct contribution ban of RCW 42.17A.417(2)(a). If a foreign national could simply donate to a domestic organization and then vote to direct those funds to support a specific campaign, they would be able to circumvent the contribution ban altogether. Federal courts recognize that the FEC's ban on donors making contributions in the name of another serves a compelling interest in preventing

No. 83836-9-I/37

circumvention of limits on contributions by individuals, including foreign nationals. *See Fed. Election Comm'n v. Rivera*, 333 F.R.D. 282, 286 (S.D. Fla. 2019). The PDC's regulation extending to "indirect participation" by foreign nationals is similarly designed to prevent circumvention of the direction contribution ban.

The Challengers finally argue that the State has adequately safeguarded its interests by limiting statewide legislative and executive offices to citizens under article II, § 7 and article III, § 25 of the Washington Constitution. The test, however, is not whether other methods exist to protect a compelling government interest, but whether the interest would be achieved less effectively absent the regulation. *Matter of Recall of Inslee*, 199 Wn.2d 416, 430, 508 P.3d 635 (2022). A regulation is narrowly tailored as long as "the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 431 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). As the State points out, the constitutional limitations on who can run for elective office would not ensure that foreign nationals do not fund the campaigns of eligible candidates.

The State has a compelling interest in limiting foreign financial participation in our political processes. RCW 42.17A.417(2)(b)'s ban on foreign national involvement in decisions regarding the distribution and financing of political contributions is narrowly tailored to advance that interest. The law does not prevent general political discussions, nor does it dictate who can and cannot be associated with the organizational challengers. Its prohibitions are limited to the campaign finance decisions of those organizations with which foreign nationals are

- 37 -

involved. We conclude that the prohibition on foreign national participation in "express advocacy" passes strict scrutiny.

E. Discrimination Based on Alienage Under Article I, Section 12

The Challengers argue that RCW 42.17A.417 facially discriminates against Washington residents based on alienage in contravention of article I, § 12. We reject this argument as well.

The equal protection clauses of the Fourteenth Amendment and article I, § 12 of the Washington Constitution require that people similarly situated under the law receive similar treatment from the State. *In re K.R.P.*, 160 Wn. App. 215, 229, 247 P.3d 491 (2011). To determine whether a statute violates equal protection, one of three tests is employed—strict scrutiny, intermediate scrutiny, or the rational basis test. *Id.* The appropriate level of scrutiny depends on the nature of the classification and the rights involved. *Id.*

In general, suspect classifications such as alienage, are subject to strict scrutiny, as are laws that affect fundamental rights or liberties. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). Intermediate scrutiny applies if the statute implicates both an important right and a semi-suspect class not accountable for its status. *K.R.P.*, 160 Wn. App. at 229. In the absence of either a fundamental right or a suspect class, or an important right and a semi-suspect class, a law will receive rational basis review. *Id.* at 229-30. If strict scrutiny applies, the State must show that the law serves a compelling state interest by the least restrictive means practically available. *Bernal*, 467 U.S. at 227.

The Supreme Court has developed a narrow exception to the rule that

discrimination based on alienage triggers strict scrutiny. Under the political function exception, aliens are only considered a suspect class for legislation that harms their economic interests or "str[ikes] at the non-citizens' ability to exist in the community." *Foley*, 435 U.S. at 294-95 (states require police officers to be citizens). Aliens are not considered a suspect class for laws that are "intimately related to the process of democratic self-government." *Bernal*, 467 U.S. at 220 (discussing political function exception test); *Ambach v. Norwick*, 441 U.S. 68, 99 S. Ct. 1589, 60 L. Ed. 2d 49 (1979) (state may bar aliens who have no intent to become citizens from teaching in public schools); *Cabell*, 454 U.S. at 447 (state may bar aliens from positions as probation officers). If alienage is not a suspect classification under this economic-political distinction, then the State need only justify the classification by showing some rational relationship between the interest it seeks to protect and the limiting classification. *Foley*, 435 U.S. at 296.

RCW 42.17A.417 does not harm any foreign national's ability to earn a living in our community. Its focus is alien participation in electoral campaigns. While the rational basis test may be the most applicable, we nevertheless conclude that even if strict scrutiny applies, the statute does not violate the Challengers' equal protection rights. The State has a compelling interest in limiting the participation of non-Americans in the activities of democratic self-government and a law that excludes foreign nationals from political spending is the least restrictive means available of achieving that interest.

- 39 -

No. 83836-9-I/40

## CONCLUSION

RCW 42.17A.417 does not violate the Challengers' free speech rights or their rights of association under article I, § 4 or § 5, or violate article I, § 12 of the Washington Constitution. The State has a compelling government interest in excluding foreign nationals from participating in election financing, directly with their own contributions, and indirectly by voting to have organizations with which they affiliate make such contributions. The statute and accompanying regulation, WAC 390-16.330, do not prohibit foreign nationals from participating in issue advocacy or from endorsing candidates or ballot measures when those endorsements are not made in the context of their organizations' decision to provide the candidates or ballot measure campaigns with financial support. The law serves a compelling government interest and is narrowly tailored to meet that interest.

We therefore affirm.

Andrus, C.J.

WE CONCUR:

Coburn, J.                              Mann, J.

- 40 -